No. 97-137

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 157

STATE OF MONTANA,

Plaintiff and Respondent,

v.

SUSAN HOCEVAR,

Defendant and Appellant.

APPEAL FROM: District Court of the Sixteenth Judicial District,

In and for the County of Custer,

The Honorable Joe L. Hegel, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jay F. Lansing (argued); Moses Law Firm, Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; John Paulson (argued),

Assistant Attorney General; Helena, Montana

Garry P. Bunke, Custer County Attorney, Miles City, Montana

For Amicus Curiae:

Joseph E. Thaggard, Montana County Attorneys' Association,

Helena, Montana

Argued: October 1, 1998

Submitted: November 19, 1998

Decided: June 19, 2000

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Susan Hocevar (Susan) was convicted by a jury of criminal endangerment with regard to her son Wesley Hocevar's (Wesley) ingestion of an overdose of Benadryl. She appeals from the judgment of the Sixteenth Judicial District Court, Custer County, finding by a preponderance of the evidence that Susan exemplified Munchausen Syndrome By Proxy (MSBP) and smothered her sons Zachary and Mathew, Jr. (Mathew) and considering that conduct in sentencing Susan for the criminal endangerment conviction. The District Court further found that she was not entitled to be classified a first-time nonviolent offender for sentencing purposes. Susan appeals from the final judgment entered as to the criminal endangerment conviction and from the District Court's denial of Susan's motion to dismiss counts III, IV, and V of the Information upon double jeopardy grounds.

¶2 We affirm in part and reverse and remand in part.

### Issues

In reviewing the District Court's judgment we consider the following issues:

¶3 1. Whether the evidence was sufficient to support Susan's conviction of the felony offense of criminal endangerment under § 45-5-207(1), MCA.[1]

¶4 2. Whether the jury was properly instructed on the elements of criminal endangerment.

¶5 3. Whether Susan's motion for a new trial based on alleged juror misconduct was properly denied.

¶6 4. Whether the videotapes of interviews with Wesley Hocevar should have been admitted into evidence.

¶7 5. Whether the expert testimony on MSBP was properly admitted.

¶8 6. Whether Susan's motion to sever counts I and II and counts III, IV, and V for separate trials was properly denied

¶9 7. Whether Dr. David Southall's testimony was properly admitted.

¶10 8. Whether evidence concerning Zachary Hocevar's death was properly admitted pursuant to Rule 404(b), M.R.Evid.

¶11 9. Whether considering the deaths of Mathew and Zachary Hocevar in determining Susan's sentence for criminal endangerment violated Susan's right to due process under Article II, Section 17 of the Montana Constitution.

¶12 10. Whether Susan should have been classified a first-time, nonviolent offender for sentencing purposes.

¶13 11. Whether Susan's renewed motion to dismiss counts III, IV, and V based on double jeopardy grounds was properly denied.

a. Whether Susan's motion to dismiss counts III, IV, and V for insufficiency of the evidence should have been granted, barring further prosecution pursuant to § 46-16-403, MCA.

b. Whether further prosecution of counts IV and V is barred by the hung jury on Count III.

c. Whether further prosecution of counts III, IV, and V is barred by § 46-11-503, MCA?

Facts

¶14 On the afternoon of May 21, 1992, Susan was baking cookies at the Hocevar family

home in Miles City, Montana. Susan's then four-year-old son Wesley was not feeling well and complained that his head hurt, so Susan put two Children's Tylenol tablets or a dose of Tylenol elixir[2] on the coffee table in the living room. At trial, Dr. Pezzarossi, who, with her partner Dr. Young, had been Wesley's and his deceased brother Mathew's pediatrician, testified that Susan later told her that there had been no water on the table. Pezzarossi also testified that Wesley was not able to swallow capsules without water. Susan testified at trial that Wesley had a cup of water. Also on the coffee table was a bottle of Benadryl capsules without a cap. Susan habitually removed the plastic wrappers from Benadryl capsules and put them in a bottle so that she would have quicker access to them at the onset of an allergy attack. When Susan set the Children's Tylenol on the coffee table for Wesley, about ten or twelve 25-milligram Benadryl capsules were remaining in the bottle. Susan told Wesley to take his medicine and resumed baking cookies in the kitchen.

¶15 When Susan asked Wesley if he had taken his medicine, he replied, "I took all my medicine." Susan continued baking cookies and a neighbor stopped by. Susan briefly visited with him in the living room and noticed, after the neighbor had left, that her Benadryl was gone. The Children's Tylenol was still sitting on the coffee table. Wesley confirmed that he had eaten the Benadryl capsules. Pezzarossi testified at trial that Susan later told her that she did not find pieces of the Benadryl on the floor, which might have indicated that Wesley had not taken all of the Benadryl. Susan testified that Wesley had tried to take other people's medicine on other occasions and that he had previously tried to take more vitamins than he was supposed to take. Susan unsuccessfully tried to phone her husband, Mathew Hocevar, Sr. (Mathew, Sr.), and then instructed the neighbor who had just visited to pick up Mathew, Sr. from work. Susan then called the emergency room and tried unsuccessfully to reach Dr. Young. Mathew, Sr. arrived at home and he and Susan took Wesley to the emergency room at Holy Rosary Hospital in Miles City.

¶16 The hospital called Pezzarossi. Wesley's stomach was rinsed and he was given activated charcoal and a laxative to quickly remove the Benadryl from his system. Pezzarossi testified at trial that the Hocevars informed her that Wesley had ingested approximately 250 to 300 milligrams of Benadryl and that Pezzarossi was aware at the time of treating Wesley that the lethal dose for a child of Wesley's weight was 480 milligrams. She further testified that the symptoms of a Benadryl overdose include a fast heart rate, dilated pupils, hallucinations, combativeness, agitation, and hyperactivity. Pezzarossi testified that she observed hallucinations in Wesley. She also testified that she was aware that an overdose of Benadryl could lead to seizures, but the record does not reflect that Wesley suffered any seizures following the overdose. Wesley was placed in the

Intensive Care Unit for observation overnight and was released on the following day.

¶17 Pezzarossi was concerned that Wesley's Benadryl overdose might not have been accidental, partly based on her prior experience with Wesley's brother Mathew. Mathew died in December 1991 at the age of ten months. Pezzarossi first saw then six-month-old Mathew in August 1991, shortly after the Hocevars had moved to Montana from California. Susan informed Pezzarossi that Mathew had been on an apnea monitor in California, a device that alarms at a heart beat or respiration abnormality, because another Hocevar child, Zachary, had died of Sudden Infant Death Syndrome (SIDS). Although Mathew appeared normal to Pezzarossi, she therefore decided to prescribe another apnea monitor for him.

¶18 Pezzarossi testified that subsequent to the August office visit, Mathew was hospitalized several times and brought in for office visits several times, for problems including seizures, viral infections, and diarrhea. At the time of Mathew's last office visit on December 5, 1991, Pezzarossi testified that Susan felt that Mathew had been back to normal for several days and that Pezzarossi's examination of Mathew was normal. On December 19, 1991, Pezzarossi was summoned to the emergency room for a code blue (a child undergoing cardiopulmonary resuscitation) involving Mathew. Mathew was unable to breathe on his own and died the following day.

¶19 Pezzarossi feared that Susan exhibited the symptoms of MSBP[3] and consulted with specialists about the situation. The Montana Department of Family Services removed Wesley from the Hocevar home on May 22, 1992, the day he was released from the hospital following the overdose. Wesley was place in a foster home for several weeks and then lived with Mathew, Sr.'s parents. After an investigation, Wesley was returned to Susan and Mathew, Sr. in November 1993. Susan gave birth to a girl, Chelsea, in April 1993, who was also placed in a foster home until being returned to Susan and Mathew, Sr. in November 1993. Since then, the Hocevars have become parents to another girl. Susan's sentence has been stayed pending this appeal, and she continues to reside in Miles City with Mathew, Sr. and their three living children.

## Procedural Background

¶20 On February 16, 1994, Susan was charged by information with commission of the following offenses:

Count I:  Attempted Deliberate Homicide, in violation of § 45-4-103, MCA; or, in the alternative to Count I only;

Count II: Criminal Endangerment, in violation of § 45-5-207, MCA;

Count III: Assault, in violation of § 45-5-201(1)(a) and (3), MCA;

Count IV: Deliberate Homicide, in violation of § 45-5-102(1)(b), MCA;

or, in the alternative to Counts III and IV only;

Count V:  Deliberate Homicide, in violation of § 45-5-102(1)(a), MCA.

The Information alleged, with regard to counts I and II, that Susan had provided an overdose of Benadryl to Wesley and, with regard to counts III, IV, and V, that Susan had smothered Mathew.

¶21 The District Court granted Susan's motion for a change of venue and a jury trial commenced in Billings on April 17, 1995. The court dismissed Count I after the close of the State's case, finding that there was "insufficient evidence for the jury to find the essential element of having a purpose to cause Wesley's death beyond a reasonable doubt." On May 13, 1995, the jury returned a guilty verdict on Count II, but was unable to reach a unanimous verdict on counts III, IV, and V. Susan filed motions for a new trial and to dismiss the remaining counts on double jeopardy grounds. The District Court denied both motions. On January 31, 1997, the District Court issued its sentencing memorandum, committing Susan to the Department of Corrections for ten years. Susan moved for her release pending appeal and the court stayed her sentence pending this appeal.

Discussion

Issue 1

¶22 Whether the evidence was sufficient to support Susan's conviction of the felony offense of criminal endangerment under § 45-5-207(1), MCA.

¶23 When reviewing whether evidence was sufficient to support a criminal conviction, this Court views the facts in a light most favorable to the prosecution. The standard of review is whether " 'any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.' " State v. Larson (1992), 255 Mont. 451, 456, 843 P.2d 777, 780-81 (citations omitted).

¶24 Section 45-5-207, MCA, Montana's criminal endangerment statute, reads in pertinent part: "A person who knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of criminal endangerment." "A person commits the offense of criminal endangerment when he is aware that there is a high probability that his conduct may cause a substantial risk of death or serious bodily injury to another." State v. Smaage (1996), 276 Mont. 94, 98, 915 P.2d 192, 195 (citing State v. Crisp (1991), 249 Mont. 199, 203, 814 P.2d 981, 983). "Serious bodily injury" is defined as "bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ. . . ." Section 45-2-101(59), MCA. Susan contends that the only applicable statutory definition of "serious bodily injury" is bodily injury that creates a substantial risk of death, but the jury instruction contained the entire statutory definition.

¶25 Susan argues that her conduct alleged by the State, i.e., making the Benadryl available to Wesley, did not actually create "a substantial risk of death or serious bodily injury." Under Montana's criminal endangerment statute, the State did not have to prove that Susan's conduct actually resulted in bodily injury to Wesley. What the State had to prove was that Susan was aware that there was a high probability that making the Benadryl available to Wesley created a specific result-a substantial **risk** of death or serious bodily injury. A rational jury could have found that Susan's conduct created both a substantial risk of death and of serious bodily injury based on the evidence the State presented at trial.

¶26 Susan's reliance on State v. Andrews (1995), 274 Mont. 292, 907 P.2d 967, is misplaced. There, the defendant was charged with aggravated assault, which requires proof that the defendant actually "purposely or knowingly cause[d] serious bodily injury to another." Section 45-5-202(1)(a), MCA. Criminal endangerment, on the other hand, does not require that the defendant actually caused death or serious bodily injury, but that the defendant's conduct created a substantial risk of death or serious bodily injury. Susan made approximately 250 to 300 milligrams of Benadryl available to Wesley. A lethal dose of Benadryl for a child of Wesley's size is 480 milligrams. The District Court correctly concluded that it was a jury question whether such an overdose poses a substantial risk of death. Evidence that Wesley was actually in danger of dying from the overdose was not required to prove the offense of criminal endangerment.

¶27 Further, a rational jury could have found that Susan's conduct created a substantial risk of serious bodily injury, defined as "bodily injury which causes serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ. . . ." Section 45-2-101(59), MCA. Pezzarossi testified that an overdose of Benadryl could lead to seizures. It is irrelevant that Wesley did not actually suffer any seizures. Again, the criminal endangerment statute does not require actual injury, but risk of injury. The evidence presented by the State was sufficient for the jury to convict Susan of criminal endangerment pursuant to § 45-5-207(1), MCA, under either statutory definition of serious bodily injury.

¶28 Finally, Susan contends that the State failed to prove that she knowingly made the Benadryl available to Wesley. She speculates that by affirming her conviction, we open the doors to such an expansion of the criminal endangerment statute that gun dealers and pharmacists could subject themselves to criminal liability by making a firearm or medication available to a person, knowing the firearm or medication could cause a substantial risk of death if used in an improper manner. Indeed, a gun dealer would be subject to criminal liability for placing a loaded firearm within reach of a four-year-old child as would a pharmacist for placing medication within reach of a child. However, the criminal liability of a mother who not only places medication in reach of her young child, but next to the medicine she has instructed the child to take is hardly comparable to a gun dealer selling a firearm or a pharmacist selling medication to a legal customer. The State presented sufficient evidence that Susan knowingly made the Benadryl available to Wesley by leaving ten to twelve capsules thereof in an open bottle on the same coffee table that held the medicine Susan instructed Wesley to take.

¶29 Having reviewed the evidence in a light most favorable to the prosecution, we conclude that a rational jury could have found beyond a reasonable doubt that Susan knowingly engaged in conduct that created a substantial risk of death or serious bodily injury to Wesley by making the Benadryl available to him.

Issue 2

¶30 Whether the jury was properly instructed on the elements of criminal endangerment.

¶31 We review a district court's discretionary rulings in a criminal case to determine whether the court abused its discretion. *See* State v. Sullivan (1994), 266 Mont. 313, 324, 880 P.2d 829, 836. We give broad discretion to a district court in formulating jury

instructions. *See* State v. Goulet (1997), 283 Mont. 38, 41, 938 P.2d 1330, 1332 (citation omitted).

¶32 The instruction given to the jury with regard to the criminal endangerment count read in relevant part:

To convict the defendant of criminal endangerment, the State must prove the following elements:

1. That the defendant engaged in conduct that created a substantial risk of

death or serious bodily injury to Wesley Hocevar; and

2. That the defendant acted knowingly.

The court also instructed the jury on the definition of "knowingly" by giving the then-standard Montana instruction setting forth the statutory definition of knowingly. During its deliberations, the jury asked three questions concerning the criminal endangerment instruction: (1) Is making a mistake a criminal offense if it causes a risk? (2) Does knowingly in the charge of Criminal Endangerment mean that the defendant was aware of causing risk? (3) In regard to Criminal Endangerment and Instruction 19, does a person only need to be aware of their actions, or, do they have to be aware that the consequences of their actions constitute a substantial risk?

¶33 At issue in this appeal is the court's response to questions two and three. The court gave an additional instruction, which the parties agreed upon, in response to the second question and then referred the jury to that instruction in response to the third question. The instruction consisted of the following statement, citing this Court's decision in State v. Crisp (1991), 249 Mont. 199, 203, 814 P.2d 981, 983:

A person commits the offense of criminal endangerment when she is aware of a high degree of probability that her conduct will cause a substantial risk of death or serious bodily injury to another.

The jury's questions certainly could have been answered more clearly and emphatically, i. e., that the defendant must be aware of both conduct and risk. However, we find that the jury was properly instructed with regard to the elements of criminal endangerment; specifically, that the defendant had to be aware of her conduct and of the high probability

of the risk posed by her conduct. The additional *Crisp* instruction properly states the law from our decision in State v. Lambert (1996), 280 Mont. 231, 929 P.2d 846, which was decided after the trial. There, we held that the " 'knowingly' element of criminal endangerment contemplates a defendant's awareness of the high probability that the conduct in which he is engaging . . . will cause a substantial risk of death or serious bodily injury to another." *Lambert*, 280 Mont. at 237, 929 P.2d at 850.

¶34 The District Court did not abuse its discretion in instructing the jury on the elements of criminal endangerment.

Issue 3

¶35 Whether Susan's motion for a new trial based on alleged juror misconduct wasproperly denied.

¶36 We review a district court's ruling on a motion for a new trial to determine whether the court abused its discretion. Absent an abuse of discretion, we will affirm a district court's decision concerning whether or not to grant a motion for a new trial. State v. Walker (1996), 280 Mont. 346, 354, 930 P.2d 60, 64-65 (citations omitted).

¶37 During the course of the jury's deliberations, the District Court received several questions and notes from the jury regarding one of the jurors, Joseph Sullivan (Sullivan). The jury asked, "Can we discredit a juror?" The foreperson sent a note stating:

> I believe that 11 people sat down at the table Monday ready to deliberate. I believe one person set out to keep us from following the instructions, weighing the evidence, using our collective memory to weigh the evidence, studying the exhibits and deliberating this case.

The court received the following note from another juror requesting that the judge meet with the foreperson:

> We have all been working together for the last week. Eleven of us have deliberated fairly and honestly. However, we have one juror who has manipulated the rest of us for 4 days. The eleven of us feel we have been betrayed and not allowed to do "our job" as specified by the court due to the narrow viewpoint of the one individual.

¶38 Susan filed a motion for a mistrial based upon a breakdown in the deliberative process of the jury, which the court denied. The jury returned a guilty verdict on the criminal endangerment count. When the jurors were subsequently polled, Sullivan stated, "No, I've changed my mind." The court directed the jurors to retire to the jury room to again consider whether they could reach a unanimous verdict on the criminal endangerment count. Shortly thereafter, the jury returned a unanimous verdict of guilty.

¶39 Following the trial, Susan moved for a new trial based in part on her contention that juror misconduct had denied her a fair trial. In support, she introduced an affidavit prepared by Sullivan alleging that he had been unaware of the jurors' notes and their attempt to discredit him. Sullivan further alleged that he would not have changed his mind back to guilty had he been aware of the jurors' allegations and notes to the judge. The State moved to strike the affidavit pursuant to Rule 606(b), M.R.Evid. The court ordered the affidavit stricken and found no evidence of juror misconduct, with or without the affidavit. The court thus denied Susan's motion for a new trial.

¶40 Susan claims that the court erred in striking Sullivan's affidavit and denying her motion for a new trial. Motions for a new trial are governed by § 46-16-702, MCA, which states in relevant part that "the court may grant the defendant a new trial if required in the interest of justice." Rule 606(b) of the Montana Rules of Evidence states in relevant part that:

> [u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. Nor may a juror's affidavit . . . concerning a matter about which the juror would be precluded from testifying be received for these purposes.

As an exception to this rule, a juror may testify or submit an affidavit on matters concerning:

> (1) whether extraneous prejudicial information was improperly brought to the jury's attention; or (2) whether any outside influence was brought to bear upon any juror; or (3) whether any juror has been induced to assent to any general or special verdict, or finding on any question submitted to them by the court, by a resort to the

determination of chance.

Rule 606(b), M.R.Evid. In striking Sullivan's affidavit, the court found that the exceptions to Rule 606(b) did not apply, because the notes were part of the jury's deliberative process. The court found that the jurors acted as they had been instructed: "you should not talk to your fellow jurors about anything that you feel necessary to bring to the attention of the judge."

¶41 The jurors' notes to the court constituted an entirely internal process and did not introduce an extraneous or outside element into the jury's deliberative process. The jurors' notes did not signal a breakdown in the jury's deliberative process as Susan contends. The jurors had been instructed to bring questions and problems to the judge's attention. We fail to see how the jurors' notes could have had any bearing on the issue of Susan's guilt or innocence. Even assuming *arguendo* that the jurors' notes affected Sullivan's vote, such testimony is prohibited by Rule 606(b), M.R.Evid., and the District Court properly struck Sullivan's affidavit.

¶42 The District Court did not abuse its discretion in striking the affidavit and denying Susan's motion for a new trial based on alleged juror misconduct.

Issue 4

¶43 Whether the videotapes of interviews with Wesley Hocevar should have been admitted into evidence.

¶44 In regard to evidentiary matters, it is within the district court's discretion to determine whether or not evidence is relevant and admissible. *See* State v. Beavers, 1999 MT 260, ¶ 20, 987 P.2d 371, ¶ 20, 56 St.Rep. 1035, ¶ 20 (citation omitted). Absent a showing of an abuse of discretion, we will not overturn the district court's determinations on evidentiary matters. *See Beavers*, ¶ 20.

¶45 Following Wesley's overdose, Chief Robert Stabio (Stabio) of the Miles City Police Department conducted two videotaped interviews of Wesley, on May 26, 1992 and on June 2, 1992. At trial, the State did not call Wesley as a witness or attempt to introduce the videotapes. Susan sought to introduce these videotapes during the defense's case-in-chief. The District Court ruled that the videotapes were not admissible under any exception to the hearsay rule.

¶46 Susan contends that the videotapes of interviews with Wesley should have been admitted into evidence under one of three exceptions to the hearsay rule: present sense impression, recorded recollection, or other exceptions. Under Rule 803, M.R.Evid., the following, among others, are not excluded by the hearsay rule even though the declarant is available as a witness:

(1)  Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

. . . .

(5)  Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

. . . .

(24)  Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness.

¶47 The present sense impression exception to the hearsay rule applies to out-of-court statements that describe or explain an event or condition "made while the declarant was perceiving the event or condition, or immediately thereafter," and is thus inapplicable in this case. The timing element assures the trustworthiness of present sense impressions in two ways: it reduces the likelihood of faulty recollection and precludes time for reflection. *See, e.g.,* Christopher B. Mueller and Laird C. Kirkpatrick, Evidence § 8.34 (1995). Although we recognize that there could be a slight time lag between an event and the declarant's description of that event, the declarant's statement must nonetheless reflect a present sense impression rather than a description of events that were observed in the past. Absent contemporaneousness or near-contemporaneousness of event and statement, the inherent trustworthiness of a present sense impression is negated. In State v. Newman (1973), 162 Mont. 450, 457, 513 P.2d 258, 262, which was decided prior to the adoption

of the Montana Rules of Evidence but is nonetheless instructive on the timing element of Rule 803(1), M.R.Evid., we held that a statement in reference to an event that occurred the previous evening was not a present sense impression.

¶48 The videotaped interviews with Wesley were conducted five and twelve days after Wesley's Benadryl overdose. At the time of the interviews, Wesley was not describing the overdose as he was perceiving it nor immediately thereafter. Because the timing element is not satisfied, Wesley's statements to Stabio five and twelve days after the overdose cannot be considered trustworthy pursuant to the present sense impression exception. Enough time had passed that Wesley's recollection of the events could have become faulty. Wesley also had ample time for reflection during which he could have falsified or distorted the events surrounding his overdose. The admission of the videotaped interviews was properly denied under the present sense impression exception because its timing element was not satisfied.

¶49 In order to admit evidence pursuant to the recorded recollection exception, the party seeking to introduce such evidence must establish certain foundational requirements. By its terms, Rule 803(5), M.R.Evid., requires the declarant to be a witness and requires that the witness "has insufficient recollection to enable the witness to testify fully and accurately." Wesley was not a witness at trial and Susan made no showing that Wesley had insufficient recollection of the overdose. The court noted that "[t]he Defendant did not demonstrate, or even make a proffer, that Mathew could not recollect or communicate regarding the subject matter of the videotape," and held that the recorded recollection exception did not apply. The admission of the videotaped interviews was properly denied under the recorded recollection exception because its basic foundational requirement was not satisfied.

¶50 Susan finally argues that the videotapes should have been admitted pursuant the residual exception of Rule 803, which excepts from hearsay statements "not specifically covered by any of the foregoing exceptions but having comparable circumstantial guarantees of trustworthiness." Rule 803(24), M.R.Evid. The residual exception "look[s] to the circumstances surrounding a hearsay statement when it is made-the 'circumstantial guarantees of trustworthiness' that lend reliability to the hearsay statement in lieu of cross-examination." State v. J.C.E. (1988), 235 Mont. 264, 272, 767 P.2d 309, 314. "Everything that bears on the credibility of the speaker and the accuracy of his statement counts. . . ." Christopher B. Mueller and Laird C. Kirkpatrick, Evidence § 8.65 (1995). We have held that the residual exceptions "should be used sparingly, and only in exceptional

circumstances." State v. Brown (1988), 231 Mont. 334, 338, 752 P.2d 204, 207.

¶51 Here, the District Court reviewed the videotapes and found that

> Mr. Stabio and Wesley did not communicate very well. There is a lot of inconsistencies, a lot of difficulty with times, staying focused on what Mr. Stabio wanted to say, and the Court cannot say that even at that time from that, that Wesley was a competent witness at that time. It just seems to me that he, initially, at the first interview, he was saying his mother told him-at first he said no, she didn't tell him to take them. He took them because he wanted to take them. And then she did tell him to take them. And then there was, how many were there? There were this many. And that means ten or five? It just doesn't seem to me that there is anything substantive that would assist the jury with respect to that . . . .

> The admission of the videotaped interviews was properly denied under the residual exception because the videotapes did not manifest circumstantial guarantees of trustworthiness.

¶52 The videotapes were not admissible pursuant to Rule 803, M.R.Evid., as present sense impression, recorded recollection, or under the residual exception. The District Court did not abuse its discretion in refusing to admit the videotaped interviews with Wesley into evidence.

## Issue 5

¶53 Whether the expert testimony on MSBP was properly admitted.

¶54 In regard to evidentiary matters, it is within the district court's discretion to determine whether or not evidence is relevant and admissible. *See Beavers*, ¶ 20. District courts are " 'vested with *great* latitude in ruling on the admissibility of expert testimony.' " State v. Southern, 1999 MT 94, ¶ 48, 294 Mont. 225, ¶ 48, 980 P.2d 3, ¶ 48 (citations omitted). Absent a showing of an abuse of discretion, we will not overturn a district court's determinations on evidentiary matters. *See Beavers*, ¶ 20.

¶55 Susan challenged the admissibility of the MSBP expert testimony prior to trial. The District Court preliminarily ruled that the testimony would be admissible and that the jury was entitled to receive and weigh such evidence. The court noted that a further hearing

outside of the presence of the jury might be necessary. The court conducted the hearing prior to the testimony of one of the State's expert witnesses, Dr. Randall Alexander, a Professor of Pediatrics. Alexander presented his prospective testimony. The court found that the foundational requirement for admission of MSBP testimony had been satisfied and allowed the State to present Alexander's testimony regarding MSBP to the jury.

¶56 Although both parties have framed their argument with regard to the admissibility of the MSBP expert testimony around the *Daubert* standard, that standard is inapplicable because it only applies to the admissibility of novel scientific evidence. *See, e.g.,* Gilkey v. Schweitzer, 1999 MT 188, ¶ 18, 295 Mont. 345, ¶ 18, 983 P.2d 869, ¶ 18 (citations omitted). The expert testimony regarding MSBP is neither novel nor scientific. The term "Munchausen Syndrome By Proxy" has appeared in medical literature since at least 1977. *Cf.* State v. Southern, 1999 MT 94, ¶ 59, 294 Mont. 225, ¶ 59, 980 P.2d 3, ¶ 59 (holding that microscopic hair comparison evidence was not novel because the Court had considered several cases since 1978 and because comparing hair samples with a microscope had been done for decades and therefore *Daubert* standards were not applicable to determine its admissibility). While this Court has not previously addressed the admissibility of MSBP evidence, other courts have considered such evidence since 1981. *See* California v. Phillips (1981), 175 Cal.Rptr. 703. A Westlaw search reveals that the term "Munchausen Syndrome By Proxy" has appeared in over forty state and federal cases since then. Thus testimony regarding MSBP is not novel to the field of pediatrics or law.

¶57 Further, Alexander referred to MSBP as a form of child abuse in the field of pediatrics, not a psychiatric disorder, and his testimony on MSBP is therefore not scientific evidence subject to *Daubert* standards. *Cf. Gilkey*, ¶ 20 (holding that a physician's expert opinion on informed consent constitutes specialized knowledge of a medical professional, not novel scientific evidence).

¶58 Instead, we analyze the admissibility of the MSBP expert testimony under a conventional Rule 702 analysis. Rule 702 of the Montana Rules of Evidence, identical to its federal counterpart, states that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Under such an analysis, a court must, before admitting expert testimony, determine (1) whether the subject matter requires expert testimony and (2) whether the putative expert has either special training or education and has adequate knowledge on which to base an opinion. *Southern*, ¶ 60. Regarding the first prong, we have held that " '[e]xpert testimony is required in areas not within the range of ordinary training or intelligence.' " Hulse v. State, 1998 MT 108, ¶ 48, 289 Mont. 1, ¶ 48, 961 P.2d 75, ¶ 48 (citation omitted).

¶59 We hold that testimony about MSBP is beyond the range of ordinary training or intelligence and is therefore a subject matter requiring expert testimony. "[T]he dynamics of child abuse and specifically MSBP are generally not within the knowledge of the average juror." Lynn Holland Goldman & Beatrice Crofts Yorker, Mommie Dearest? Prosecuting Cases of Munchausen Syndrome By Proxy, 13 WTR Crim. Just. 2629 (1999). *Cf. Southern*, ¶ 61 (holding that microscopic hair comparison is beyond the range of ordinary training or intelligence and therefore subject on which an expert may testify); *Hulse*, ¶ 69 (holding that Horizontal Gaze Nystagmus test is beyond the range of ordinary training or intelligence and therefore subject on which an expert may testify).

¶60 Having reviewed the transcript of the admissibility hearing, we also hold that the State established sufficient foundation to show that Alexander was qualified to testify on MSBP and that he had adequate knowledge on which to base an opinion in this case. The record shows that the State sufficiently established Alexander's medical training and experience, specifically his experience with MSBP. As a Professor of Pediatrics, Alexander had written and taught on the subject. The State also established that Alexander had adequate knowledge about the Hocevar family situation on which to base his diagnosis of MSBP. Alexander testified that he was given the medical records on all the Hocevar children and a variety of investigative statements as well as some information on Susan.

¶61 The District Court did not abuse its discretion in admitting expert testimony regarding MSBP into evidence.

## Issue 6

¶62 Whether Susan's motion to sever counts I and II and counts III, IV, and V for separate trials was properly denied.

¶63 In determining whether to grant a motion to sever, the trial court must balance the possibility of prejudice to the defendant against the judicial economy which results from a

joint trial. Judicial economy weighs heavily in the balancing process. This balancing process is left to the sound discretion of the trial judge and absent an abuse of that discretion, we will not substitute our judgment for that of the trial court. The burden of showing prejudice rests on the defendant. In showing prejudice, it is not sufficient that the defendant prove some prejudice or that a better chance of acquittal exists if separate trials are held. Rather, the defendant must show the prejudice was so great as to prevent a fair trial. State v. Richards (1995), 274 Mont. 180, 188, 906 P.2d 222, 226-27 (citations omitted).

¶64 The District Court denied Susan's pretrial motion to sever the first two counts of the Information, which concerned Wesley's Benadryl overdose, from the last three counts, which concerned Mathew's death. Susan also cited the court's failure to grant the severance in support of her motion for a new trial. The court reaffirmed its holding in favor of joinder, holding that the counts related to Wesley's overdose and the counts related to Mathew's death were "similar in nature and much of the proof, which includes many out-of-state professional witnesses, would apply to all counts."

¶65 Section 46-11-404(1), MCA, states in relevant part:

Two or more offenses or different statements of the same offense may be charged in the same charging document in a separate count, or alternatively, if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same transactions connected together or constituting parts of a common scheme or plan.

Section 46-13-211(1), MCA, states in relevant part:

If it appears that a defendant . . . is prejudiced by a joinder of charges . . . in an . . . information . . . or by a joinder for trial together, the court may order separate trials . . . or provide whatever relief justice requires.

Susan contends that the joinder of counts I and II and counts III, IV, and V was improper pursuant to § 46-11-404(1), MCA, and prejudicial pursuant to § 46-13-211(1), MCA. Susan links this issue with her double jeopardy claim; however, we address the double jeopardy claim separately in our analysis of Issue 11.

¶66 Susan contends that the joinder of the two sets of charges was improper under § 46-11-

404(1), MCA, because they involve separate incidents: Wesley's May 1992 overdose, which resulted in the alternate charges of attempted deliberate homicide and criminal endangerment, and Mathew's 1991 death, which resulted in the alternate charges of assault, felony murder and deliberate homicide. She argues that Wesley's overdose and Mathew's death were dissimilar in victims, dates, and methods of commission, and were not part of a common scheme or plan. In responding to this argument in District Court, the State argued that joinder was proper because in both instances Susan injured or killed her children in an attempt to draw attention to herself.

¶67 In *Southern*, ¶ 23, we held that joinder is proper "in cases in which the charges are logically linked by motive and where overlapping proof must be offered." Here, the State, under its MSBP theory, alleged that Wesley's overdose and Mathew's death were linked by Susan's motive of drawing attention to herself by injuring or killing her children. The expert testimony on the subject of MSBP concerned all counts of the Information. Joinder of the charges resulting from Wesley's overdose and Mathew's death was proper pursuant to § 46-11-404(1), MCA, because the offenses were logically linked by the MSBP motive and the proof regarding all the charges overlapped.

¶68 Having decided that joinder was proper, we turn to the question whether joinder of the charges resulted in unfair prejudice to Susan pursuant to § 46-13-211(1), MCA. We have held that three types of prejudice may result from the joinder of charges:

> First, a jury may consider the criminal defendant facing multiple charges a "bad man" and accumulate evidence until it finds him guilty of something. Second, a jury may use proof of guilt on one count to convict the defendant of a second count even though the proof would be inadmissible at a separate trial on the second count. Third, prejudice may occur when the defendant wishes to testify on his or her own behalf on one charge but not another.

State v. Martin (1996), 279 Mont. 185, 192, 926 P.2d 1380, 1385 (citations omitted). Susan contends that the first and second types of prejudice resulted from the joinder of the charges against her. The State contends that Susan failed to meet her burden of establishing any of the three types of prejudice.

¶69 Susan argues that the joinder of charges prejudiced her by portraying her as a "bad person." She contends that the cumulative effect of the evidence presented during the three-week trial resulted in the jury wanting to find her guilty of something, even if they

could not convict her of deliberate homicide. The State contends that Susan did not establish the first type of prejudice, relying on our holding in *Martin* that "a bald assertion that the multiple charges and overlapping evidence 'invited' the jury to convict him is insufficient to meet his burden of demonstrating the existence of this first type of prejudice." 279 Mont. at 192, 926 P.2d at 1385. That holding is not quite applicable here. Albeit not in great detail, Susan does more than "baldly assert" that the joinder of charges prejudiced her. She contends that during the long trial, the State attempted to portray her as a bad person and that the jury may have convicted her of "something" in order to protect Wesley and Chelsea from further harm. Although Susan's claim of prejudice of the first type may be plausible, this type of prejudice alone is not sufficient to warrant severance. *See* State v. Richards (1995), 274 Mont. 180, 189, 906 P.2d 222, 227. *See also* State v. Campbell (1980), 189 Mont. 107, 121-22, 615 P.2d 190, 198.

¶70 We turn to the second type of prejudice claimed by Susan, that the jury used proof of guilt on one count to convict her of another count, even though the proof would have been inadmissible at a separate trial. Susan's main contention with respect to this type of prejudice is that the evidence presented at her trial was not simple and direct, as in State v. Campbell (1980), 189 Mont. 107, 615 P.2d 190. In *Campbell*, we relied on the "rationale that when the charges are few and the evidence straightforward, there is no reason to assume the jury was confused and could not keep the relevant evidence separate." *Campbell*, 189 Mont. at 122, 615 P.2d at 199. The State concedes that the evidence against Susan was complex and largely circumstantial, but argues that Susan failed to make the required showing under the second type of prejudice that proof on the first charge would have been inadmissible at a separate trial on the second charge.

¶71 A review of the record reveals that Susan failed to satisfy the threshold requirement for showing this type of prejudice-that the proof regarding Mathew's death would have been inadmissible at a separate trial on charges regarding Wesley's overdose. Without deciding whether such evidence would have been admissible at a separate trial, we therefore hold that Susan has failed to meet her burden of showing prejudice of the second type.

¶72 In attempting to sever the charges against her, it was Susan's burden to establish that prejudice resulted from the joinder. *See Martin*, 279 Mont. at 197, 926 P.2d at 1388. We conclude that Susan has failed to establish the existence of the first and the second types of prejudice resulting from joinder of the charges against her.

¶73 Moreover, joinder in this case promoted judicial economy, which weighs heavily in the District Court's balancing process in determining whether to grant a motion to sever. *See Martin,* 279 Mont. at 197, 926 P.2d at 1388. The District Court noted that many of the expert witnesses at the three-week trial came from out-of-state and their attendance and testimony at a separate trial would have required additional time and inconvenience for them as well as the expenditure of considerable additional resources by the State.

¶74 Joinder of the charges against Susan was proper and did not result in prejudice. The District Court did not abuse its discretion in denying Susan's motion to sever counts I and II and counts III, IV, and V for separate trials.

## Issue 7

¶75 Whether Dr. David Southall's testimony was properly admitted.

¶76 The determination of whether proposed testimony is admissible as rebuttal testimony in any given case is within the sound discretion of the District Court, and we will not reverse the District Court's ruling unless it abused this discretion. *See* Massman v. City of Helena (1989), 237 Mont. 234, 243, 773 P.2d 1206, 1211. The determination of "good cause" for departing from the usual order of trial and permitting the State to reopen its case-in-chief is left to the sound discretion of the district court. *See* State v. Snaric (1993), 262 Mont. 62, 69, 862 P.2d 1175, 1179 (citation omitted).

¶77 Susan presented a motion *in limine* concerning the scope of the expected rebuttal testimony of Dr. David Southall, a Professor of Pediatrics from the United Kingdom. She argued that Southall's testimony should be limited to an interpretation of the apnea monitor recordings. The District Court ruled that Southall would be permitted to testify regarding any matters to which the defense experts testified, but that his testimony should be limited to matters of record at that time or matters contained within the medical records to which the defense experts referred. The court further ruled that, to the extent Southall's testimony might exceed the scope of rebuttal, it would be allowed pursuant to § 46-16-401 (3), MCA.[(4)]

¶78 In her motion for a new trial, Susan asked the District Court to reconsider this ruling and the court held that Susan was neither surprised nor prejudiced by its allowing Southall's rebuttal testimony. The court noted that it allowed Southall's testimony in response to the defense's expert witnesses. In the alternative, it allowed Southall's

testimony as part of the State's case-in-chief. The court noted that the State had given notice that Southall, who had to travel from the U.K., would not be available early in the trial and that the court had indicated that the defense would be allowed to call other witnesses to address the issues brought up by Southall's testimony.

¶79 Susan alleges that Southall's rebuttal testimony should have been excluded on the bases that it constituted unfair surprise and that it was not based on a "new matter" first raised by the defense, but on primary allegations raised by the State in its case-in-chief. While portions of Southall's testimony may have been outside the proper scope of rebuttal testimony, the District Court specifically noted that "to the extent that [Southall's testimony] might exceed the scope of rebuttal, that would be due to the inability to get Doctor Southall here earlier. The Court will allow that under 46-16-401(3)."

¶80 Susan contends that no good cause existed to allow the prosecution to offer evidence upon its original case pursuant to § 46-16-402, MCA. She states that Southall was not contacted by the State until approximately a week or two prior to the trial, and defense counsel was first notified approximately ten to fourteen days before the trial that Southall may be called as a witness. Susan argues that the State offered no explanation as to why Southall was not contacted earlier and that therefore Southall's unavailability during the State's case-in-chief was attributable to the State's lack of diligence.

¶81 The District Court, in exercising its sound discretion whether to depart from the usual order of trial and permit the State to reopen its case-in-chief, concluded that "[t]he State had given notice early that Dr. Southall, who had to travel from England, would not be available early in the trial. The Court indicated early on that it would allow Dr. Southall's testimony and allowed the defense to call other witnesses to address the issues brought up by Dr. Southall." Susan's contention that no good cause existed to depart from the usual order of trial is not supported by the record. In State v. White (1980), 185 Mont. 213, 217, 605 P.2d 191, 193, this Court found good cause to depart from the usual order of trial when the State had difficulty in locating the witness, even though that difficulty may have been caused in part by the State's failure to subpoena the witness prior to trial. There, we held that good cause existed because the State kept the trial court and the defendant informed of its difficulty in locating the witness and of its intention to call the witness when he was located. We also noted that, in permitting the State to reopen its case, the trial court gave the defendant full opportunity to rebut the witness' testimony. *White,* 185 Mont. at 217, 605 P.2d at 193.

¶82 Likewise here, even if Southall's unavailability early in the trial may be in part attributable to the State not contacting him earlier, the State kept the trial court and the defendant informed that Southall would not be available until the end of the trial. The trial court informed Susan early on that it would allow Southall's testimony and that it would allow the defense to call other witnesses to address the issues brought up by Southall's testimony.

¶83 The District Court did not abuse its discretion in admitting Southall's testimony.

Issue 8

¶84 Whether evidence concerning Zachary Hocevar's death was properly admitted pursuant to Rule 404(b), M.R.Evid.

¶85 A district court has broad discretion to determine whether other crimes, wrongs or acts evidence is relevant and admissible under Rule 404(b), M.R.Evid. *See* State v. Henderson (1996), 278 Mont. 376, 379-80, 925 P.2d 475, 477-78. Absent a showing of an abuse of discretion, we will not overturn a district court's determinations on evidentiary matters. *See Beavers*, ¶ 20.

¶86 The State gave pretrial notice of its intent to introduce evidence of Zachary's death pursuant to Rule 404(b), M.R.Evid., for the purposes of proving:

(1) that Susan engaged in a common plan or modus operandi pursuant to which she unlawfully caused the deaths of Zachary and Mathew;

(2) that the death of Mathew and the poisoning of Wesley were neither natural nor accidental; and

(3) that Susan's affliction with MSBP gave her motive to smother Mathew.

Susan filed a motion *in limine* to prohibit the State from introducing this other crimes, wrongs or acts evidence. The District Court denied the motion following a hearing. Susan renewed her objection to this evidence in her motion for a new trial. In denying the motion, the District Court held that Zachary's and Wesley's medical histories bore remarkable similarities regarding the phenomenon of MSBP and that Zachary's death was thus admissible to show motive and absence of any other cause pursuant to Rule 404(b), M.R.Evid., and State v. Matt (1991), 249 Mont. 136, 814 P.2d 52.

¶87 Susan argues that, contrary to the State's Notice, the evidence of Zachary's death was not intended to prove common plan or modus operandi, but to show Susan's "character," i. e., MSBP, and that she acted in conformity with that character. Susan asserts that the State used the evidence of Zachary's death to show that she suffered from MSBP and then used MSBP as the common plan or motive for her actions against Mathew and Wesley.

¶88 Susan analogizes the introduction of evidence of Zachary's death to a situation where the State seeks to introduce evidence of past burglaries to show a that defendant charged with burglary is a kleptomaniac and acted in conformity with that diagnosis. We agree with the State that this analogy is not apt. As the District Court noted in allowing the MSBP evidence, MSBP is not a psychiatric diagnosis of a mental disorder, such as kleptomania. Rather, MSBP is a pediatric diagnosis of a form of child abuse, where the "disorder" consists of the behavior of the person suffering from it. Unlike in the case of a mental disorder, there is no distinction between the disorder and the behavior associated with that disorder. As such, MSBP does not describe Susan's character, but her behavior toward her children.

¶89 The Modified *Just* Rule guides the District Court's discretion in admitting other crimes, wrongs or acts evidence under Rules 404(b) and 403, M.R.Evid.:

(1) The other crimes, wrongs or acts must be similar.

(2) The other crimes, wrongs or acts must not be remote in time.

(3) The evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity with such character; but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(4) Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*Matt, 249 Mont. at 142, 814 P.2d at 56. Applying the Modified Just Rule to the evidence of Zachary's death, we conclude that the District Court did not abuse its discretion in allowing the evidence.*

¶90 We limit our discussion to the third and fourth requirements of the Modified *Just* rule. Susan does not raise the second requirement in her briefs and cites no legal authority in support of her argument that Zachary's death was not similar to Wesley's overdose. Because Susan cites to no authority as required by Rule 23(a)(4), M.R.App.P., and recognizing that she bears the burden of establishing error by the trial court (*see* Duck Inn, Inc. v. Montana State Univ.-Northern (1997), 285 Mont. 519, 523, 949 P.2d 1179, 1181), we decline to address her argument regarding the first requirement of the Modified *Just* rule.

¶91 The evidence of Zachary's death was introduced to show motive and not, as Susan contends, that she acted in conformity with her character-MSBP-in causing Mathew's death and Wesley's overdose. The evidence was thus properly admitted under the third requirement of the Modified *Just* rule because it was introduced to establish MSBP as Susan's motive for smothering Mathew and poisoning Wesley, not to establish MSBP as Susan's character and that she acted in conformity therewith.

¶92 Finally, Susan argues that the evidence of Zachary's death was inadmissible under the fourth requirement because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, and waste of time. With regard to counts I and II, concerning Wesley's overdose, Susan contends that the evidence of Zachary's death caused undue prejudice and that, because Alexander did not testify with certainty that Wesley's overdose was consistent with MSBP, the evidence only served to mislead the jury, cause undue delay, waste of time, and confusion of the issues. With regard to counts III, IV, and V, concerning Mathew's death, Susan contends that the evidence of Zachary's death caused undue prejudice because the State wanted the jury to be aware that two of the Hocevar children had died, leaving them to question how this could happen absent some wrongdoing.

93 ¶This Court has previously recognized that other crimes evidence will inevitably have some prejudicial effect on a defendant. *See* State v. Anderson (1996), 275 Mont. 344, 349, 912 P.2d 801, 804 (citing State v. Brooks (1993), 260 Mont. 79, 84, 857 P.2d 734, 737). The evidence of Zachary's death had great probative weight because it tended to establish the diagnosis of MSBP, which the State alleged as Susan's motive for smothering Mathew and poisoning Wesley. While it is possible that the jury could have viewed the deaths of two Hocevar children with suspicion, such inevitable prejudice does not rise to the level of outweighing the probative weight of the evidence of Zachary's death.

¶94 The District Court did not abuse its discretion in admitting evidence of Zachary'sdeath pursuant to Rule 404(b), M.R.Evid.

## Issue 9

¶95 Whether considering the deaths of Mathew and Zachary Hocevar in determining Susan's sentence for criminal endangerment violated Susan's right to due process under Article II, Section 17 of the Montana Constitution.

¶96 Our review of questions of constitutional law is plenary. *See* State v. Anderson, 1998 MT 258, ¶ 6, 291 Mont. 242, ¶ 6, 967 P.2d 413, ¶ 6.

¶97 In the State's Supplemental Authority to its Sentencing Memorandum, it argued that the District Court should consider Mathew's death in sentencing Susan. Susan argued that it would be inappropriate to consider Mathew's death, which had been charged but resulted in a hung jury. The District Court determined that it should consider all relevant testimony in sentencing Susan, including testimony regarding the deaths of Mathew and Zachary. The court found that, "[b]ased on the preponderance of the evidence, . . . Susan Hocevar exemplifies Munchausen's Syndrome By Proxy and suffocated Zachary Hocevar and Mathew Hocevar, Jr., and that the benadryl overdose may also be a manifestation of the syndrome." The court noted that "[a]lthough the Court will consider such conduct [Mathew's and Zachary's deaths], the Court's finding does not constitute a conviction of such other offenses and the sentence the court imposes in this case is a sentence only for the Criminal Endangerment charge and not for the other offenses."

¶98 We hold that considering the deaths of Zachary and Mathew in sentencing violated Susan's right to due process under Article II, Section 17 of the Montana Constitution-specifically the due process guarantee against having her sentence predicated on misinformation-and we therefore do not reach the issue whether considering Zachary's and Mathew's deaths in sentencing violated Montana's double jeopardy clause. We further do not reach the issue whether United States v. Watts (1997), 519 U.S. 1144, 117 S.Ct. 633, 136 L.Ed.2d 554, or other federal cases may be applicable precedent.

¶99 We take notice of our decision in State v. Anderson, 1998 MT 258, 291 Mont. 242, 967 P.2d 413, which we decided subsequent to the filing of the briefs in this case. There, we held that the double jeopardy clause of the United States Constitution did not bar prosecution of a DUI charge that had previously been considered in sentencing on a

separate conviction. In *Anderson*, we did not consider a due process challenge, but decided the issue solely pursuant to the double jeopardy clause of the United States Constitution.

¶100 We have previously held that a convicted defendant " 'has a due process guarantee against a sentence predicated on misinformation.' " Bauer v. State, 1999 MT 185, ¶ 21, 295 Mont. 306, ¶ 21, 983 P.2d 955, ¶ 21 (citing State v. Orsborn (1976), 170 Mont. 480, 486, 555 P.2d 509, 513). To help assure that the sentencing court does not rely on misinformation, the defendant has an affirmative duty to present evidence showing the inaccuracies contained in the presentence investigation report. *See* State v. McPherson (1989), 236 Mont. 484, 490, 771 P.2d 120, 124 (citations omitted).

¶101 In *Orsborn*, which we cited with approval in *Bauer*, we held that a sentencing judge could rely on facts outside of the presentence report in determining defendant's sentence, provided that the defendant was given an opportunity to explain or rebut that information at the presentence hearing. We held there that the sentencing judge had averted any danger of relying on misinformation in sentencing and due process had not been offended by admitting information outside of the presentence report because (1) the defendant was represented by counsel at the time the sentencing information was made known to him; (2) the defendant was provided an opportunity to rebut that information; and (3) the defendant, rather than rebutting the information, chose to affirm its accuracy. *See Orsborn*, 170 Mont. at 486, 555 P.2d at 513 (citations omitted).

¶102 In State v. Baldwin (1981), 192 Mont. 521, 524, 629 P.2d 222, 224, we held that the sentencing court could consider the underlying facts of a previous charge of which the defendant had been acquitted. While we held that considering acquitted conduct did not offend the double jeopardy clause, we pointed out that "[a] defendant is entitled to have his sentence predicated on substantially correct information." *Baldwin*, 192 Mont. at 524, 629 P.2d at 224 (citations omitted). There, the sentencing judge relied on information in the presentence investigation report, which contained the defendant's volunteered version of the underlying facts of his previous acquittal. *Baldwin*, 192 Mont. at 524, 629 P.2d at 224. The defendant did not challenge the accuracy of the information at the sentencing hearing. *Baldwin*, 192 Mont. at 525, 629 P.2d at 224.

¶103 Here, the District Court denied Susan due process by finding by a preponderance of the evidence that she smothered Zachary and Mathew without affording her an opportunity procedurally-during the sentencing phase-to challenge the accuracy of this information, which was not contained in the presentence investigation report. The

presentence investigation report makes no mention of including Zachary's and Mathew's deaths in determining Susan's sentence; thus denying Susan the opportunity to challenge the information at the sentencing stage.

¶104 Mathew's death was charged and tried with the charges relating to Wesley's overdose. The charges relating to Mathew's death, however, resulted in a hung jury. Although evidence as to Zachary's death was admitted during the guilt phase of the trial pursuant to Rule 404(b), M.R.Evid., the State did not attempt to prove that Susan smothered Zachary under any burden of proof. Thus Susan's effort at the trial was to raise a reasonable doubt in regard to her guilt for Wesley's overdose and Mathew's death. The facts regarding Mathew's and Zachary's deaths were highly disputed (as evidenced by the jury's inability to reach a verdict on counts III, IV, and V) and the District Court, in order to avoid relying on misinformation in sentencing Susan based on information outside of the presentence investigation report, owed Susan the procedural opportunity to explain or rebut this information during the sentencing stage.

¶105 We hold that the District Court denied Susan due process in considering Zachary's and Mathew's deaths without giving her the opportunity to explain or rebut this information during the sentencing phase of the trial. We reverse on this issue and remand for resentencing consistent herewith.

Issue 10

¶106 Whether Susan should have been classified a first-time, nonviolent felony offender for sentencing purposes.

¶107 The District Court's refusal to classify Susan as a first-time nonviolent felony offender involves a question of statutory interpretation. We review a district court's interpretation of the law, including questions of statutory interpretation, to determine whether the court's interpretation is correct. *See* State v. Montoya, 1999 MT 180, ¶ 16, 295 Mont. 288, ¶ 16, 983 P.2d 937, ¶ 16.

¶108 In her Sentencing Memorandum, Susan argued that she should be treated as a first-time, nonviolent offender for sentencing purposes. In its Sentencing Memorandum, the District Court found that "Susan Hocevar committed a violent offense inasmuch as she caused serious bodily injury by causing a substantial risk of death. She is not entitled to be treated as a first-time, non-violent offender."

¶109 We agree with Susan that the District Court erred in refusing to classify her as a first-time, nonviolent felony offender and sentencing her in accordance with the criteria for sentencing nonviolent felony offenders set forth in § 46-18-225, MCA. Section 46-18-104 (3), MCA, defines "nonviolent felony offender" as "a person . . . who has been convicted of a felony offense other than a crime of violence." The only relevant definition of "crime of violence" is "a crime in which the offender causes a serious bodily injury or death to a person other than himself." Section 46-18-104(2)(b), MCA.

¶110 Susan was convicted of criminal endangerment. As set forth under the discussion of Issue 1, to convict Susan of criminal endangerment, the jury had to find that Susan's conduct created a substantial **risk** of death or serious bodily injury. In contrast, § 46-18-104(2)(b), MCA, requires that an offender actually **cause** a serious bodily injury or death.

¶111 In our discussion of Issue 1, we concluded that a rational jury could have found that Susan's conduct created both a substantial risk of death and a substantial risk of bodily injury. There, we did not agree with Susan's contention that the only applicable definition of "serious bodily injury" was bodily injury that creates a substantial risk of death, but that "bodily injury which causes serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ" was also an applicable definition. While the jury could have convicted Susan under either statutory definition of "serious bodily injury," we have no way of knowing on which definition the jury relied.

¶112 In conclusion, a "crime of violence" is a crime in which the offender **causes** a serious bodily injury. Given the various options that were given to the jury, we cannot tell from the jury's verdict whether it found that Susan actually caused a "substantial risk of death" or whether she merely caused the risk of "serious permanent disfigurement or protracted loss or impairment of the function or process of any bodily member or organ." In light of the uncertainty inherent in the definitions and the verdict, the District Court erred in concluding that Susan had committed a "crime of violence."

¶113 We hold that the District Court erred in refusing to classify Susan a first-time, nonviolent felony offender for sentencing purposes. We reverse on this issue and remand for resentencing consistent herewith.

Issue 11

¶114 Whether Susan's renewed motion to dismiss counts III, IV, and V based on double jeopardy grounds was properly denied.

¶115 The denial of a motion to dismiss in a criminal case is a question of law. *See* State v. Weaver, 1998 MT 167, ¶ 43, 290 Mont. 58, ¶ 43, 964 P.2d 713, ¶ 43 (citations omitted). Our standard of review of a district court's conclusions of law is plenary and we will review the court's conclusions of law to determine whether those conclusions are correct. *See Weaver*, ¶ 43 (citations omitted).

¶116 a. Whether Susan's motion to dismiss counts III, IV, and V for insufficiency of the evidence should have been granted, barring further prosecution pursuant to § 46-16-403, MCA.

¶117 Susan argues that the District Court abused its discretion in denying her motion to dismiss counts III, IV, and V (motion for directed verdict of acquittal) on the basis of insufficiency of the evidence. She maintains that the court should have ordered a directed verdict of acquittal on the charges relating to Mathew's death and that such a verdict would bar further prosecution as to those counts. The State argues that the court did not abuse its discretion in denying Susan's motion because, as the District Court noted in denying the motion, the court had already considered and ruled against Susan's insufficiency of the evidence claim several times and did not see a reason to reverse its rulings at that juncture.

¶118 A district court should grant a motion for directed verdict of acquittal only when there is no evidence whatsoever to support a guilty verdict. State v. Campbell (1996), 278 Mont. 236, 246, 924 P.2d 1304, 1310-11 (citation omitted). A defendant is entitled to an acquittal " 'if reasonable men could not conclude from the evidence taken in a light most favorable to the prosecution that guilt has been proved beyond a reasonable doubt.' " State v. Bromgard (1993), 261 Mont. 291, 293, 862 P.2d 1140, 1141 (citation omitted).

¶119 Here, although Susan points to testimony suggesting a contrary finding and notes that she challenged the admissibility of some of this evidence, she acknowledges in her Brief that some of the evidence presented at trial supported the State's theory that Susan smothered Mathew. Dr. Gary Dale testified that in his opinion the cause of Mathew's death was smothering. Further, our review of the transcript shows that Dale based his conclusion "on a comprehensive review of all the records, the interviews, a very large amount of data." Southall testified that "it is my opinion that [Mathew] was suffocated by his mother." The fact that there is conflicting evidence in the record does not require that the

court grant Susan's motion for a directed verdict of acquittal. The weight and credibility of witnesses are exclusively the province of the trier of fact. *See* State v. Santos (1995), 273 Mont. 125, 131, 902 P.2d 510, 514. "In the event of conflicting evidence, it is within the province of the trier of fact to determine which will prevail." *Santos*, 273 Mont. at 131, 902 P.2d at 514 (citation omitted).

¶120 It is clear from the record that a reasonable juror could have concluded from the evidence taken in a light most favorable to the prosecution that guilt on counts III, IV, and V was proved beyond a reasonable doubt. We therefore conclude that the District Court did not abuse its discretion in denying Susan's motion for a directed verdict of acquittal and that further prosecution of counts III, IV, and V is not barred on these grounds.

¶121 b. Whether further prosecution of counts IV and V is barred by the hung jury on Count III.

¶122 Susan contends that the hung jury on Count III, felony assault, bars further prosecution of counts IV and V. She relies on our decision in State v. Weinberger (1983), 206 Mont. 110, 131, 671 P.2d 567, 578, where we reversed a felony murder conviction because we concluded that the evidence was insufficient to establish the underlying felony. Here, Susan was neither acquitted of the underlying felony-assault-nor have we concluded that the evidence was insufficient to establish felony assault. Further prosecution of counts IV and V is not barred by the hung jury on Count III.

¶123 c. Whether further prosecution of counts III, IV, and V is barred by § 46-11-503, MCA.

¶124 Susan contends, pursuant to the provisions of § 46-11-503, MCA, that further prosecution of counts III, IV, and V, relating to Mathew's death, is barred by her conviction of Count II, relating to Wesley's overdose. Section 46-11-503, MCA, states in relevant part:

(1) When two or more offenses are known to the prosecutor, are supported by probable cause, and are consummated prior to the original charge and jurisdiction and venue of the offenses lie in a single court, a prosecution is barred if: (b) the former prosecution resulted in a conviction that has not been set aside, reversed, or vacated; . . .

¶125 Susan argues that Count II and counts III, IV, and V are part of the "same transaction" and that the former prosecution resulted in a conviction on Count II, which

has not been set aside, reversed, or vacated. In denying Susan's motion to dismiss counts III, IV, and V, the District Court rejected this contention and concluded that, "Counts I and II dealt with the transaction involving Wesley's benadryl overdose and Counts III, IV and V dealt with the transaction involving Mathew's death. A conviction of Count II does not involve the same transaction as Counts III, IV and V and therefore does not constitute a bar to the retrial of such counts."

¶126 The court relied on our decision in State v. Berger (1993), 259 Mont. 364, 856 P.2d 552, where we held that § 46-11-503, MCA, applies only to prosecutions arising from the "same transaction," even after the 1991 amendments eliminated the "same transaction" language from subsection (1) of the statute. Susan urges this Court to overrule *Berger* and hold that in *Berger*, we violated a principle of statutory construction by adding the requirement of "same transaction" to the plain language of § 46-11-503(1)(b), MCA. We reaffirmed the "same transaction" requirement in State v. Waldrup (1994), 264 Mont. 456, 872 P.2d 772, and decline another invitation to reconsider our construction of § 46-11-503 (1)(b), MCA, here.

¶127 When Susan moved to sever the counts involving Wesley from the counts involving Mathew pursuant to § 46-11-404(1), MCA, the State resisted and the District Court denied the motion. Having successfully argued to the District Court that the Wesley counts and the Mathew counts are part of the "same transaction" for purposes of joinder, the State is then estopped from conveniently adopting a contrary position and arguing that the counts are not part of the "same transaction" for purposes of further prosecution under § 46-11-503, MCA.

¶128 Montana's joinder statute, § 46-11-404, MCA, provides in relevant part:

> Joinder of offenses and defendants. (1) Two or more offenses or different statements of the same offense may be charged in the same charging document in a separate count, or alternatively, if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same transaction connected together or constituting parts of a common scheme or plan.

The language of the joinder provision is broader than the "same transaction" language used

in the former prosecution context. That is, the joinder provision does not limit joinder to

charges arising out of the "same transaction connected together or constituting parts of a common scheme or plan[5]," but also includes charges which are of the "same or similar character." The dissent points to this distinction in concluding that the charges against Susan were joined, not because they were part of the "same transaction," but because they were of "same or similar character" in that they involved similar victims, similar locations, and were offenses of a similar nature.

¶129 The State's entire prosecutorial theme was that the counts all arose out of MSBP and were thus part of the "same transaction." In opposing Susan's motion to sever, the State was very clear as to its position:

> In this case, the State contends that Munchausen Syndrome by Proxy caused the Defendant to engage in a common plan whereby she injured her children. Moreover, the expert witnesses on the subject of Munchausen Syndrome by Proxy whom the State intends to call will provide testimony which concerns all of the counts of the Information. For those reasons the counts do constitute the same transaction connected together or constituting part of a common scheme for purpose of Mont. Code Ann. Sec. 46-11-404(1).

The State's position throughout this prosecution was that all the counts were part of the "same transaction" as that term is used in Title 46 and, in particular, the joinder statute, § 46-11-404(1), MCA. Thus, although § 46-11-404(1), MCA, does allow joinder of offenses of "same or similar character," as well as those arising out of the "same transaction," that distinction is irrelevant here because the State's theory has always been that conduct attributable to MSBP is part of the "same transaction."

¶130 The definition of "same transaction" is set forth in § 46-1-202(23), MCA. That definition applies throughout Title 46 and thus encompasses both the joinder and the former prosecution statutes. Having convinced the District Court that the counts were all part of the same MSBP transaction for purposes of joinder, the State's contention that the Mathew counts are not part of the "same transaction" for purposes of further prosecution rings hollow.

¶131 Aside from the inconsistency inherent in the State's position, the fact is that the Mathew counts and the Wesley count are part of the "same transaction" as defined in § 46-1-202(23), MCA.

> "Same transaction" means conduct consisting of a series of acts or omissions that are motivated by: (a) a purpose to accomplish a criminal objective and that are necessary or incidental to the accomplishment of that objective; . . .

Contrary to the dissent's contention that MSBP is not a "criminal objective," we determine that the seeking of attention through harming one's children is a criminal objective. The State's theory, which was supported by expert testimony, was that Susan engaged in a series of acts towards Wesley and Mathew that were motivated by a desire to accomplish a criminal objective (drawing attention to herself through harming her children) and that the overdosing of Wesley and the smothering of Mathew were necessary to the accomplishment of that objective. The Mathew counts and the Wesley count thus come within the "same transaction" element of § 46-11-503, MCA.

¶132 We reverse the District Court's conclusion and hold that, under § 46-11-503, MCA, any further prosecution of Susan for Mathew's death is barred by the former prosecution, which resulted in a conviction on Count II, relating to Wesley's overdose.

¶133 Affirmed in part and reversed and remanded in part for further proceedings consistent with this Opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ JAMES C. NELSON

Justice Terry N. Trieweiler concurring.

¶134 I concur with the majority opinion. I write separately to specially concur with subpart (c) to Issue 11 of the majority's opinion, found at paragraphs 125 to 133. While I agree with the majority's resolution of Issue 11(c), I would arrive at that same result for different reasons.

¶135 I would vote as I did in *State v. Waldrup* (1994), 264 Mont. 456, 460, 872 P.2d 772, 775, (Trieweiler, T., dissenting) to overturn *State v. Berger* (1993), 259 Mont. 364, 856 P.2d 552. Because the plain language of § 46-11-503, MCA, does not require that an offense be part of the same transaction as a previously tried offense for the statute's bar to apply, I conclude that further prosecution of Counts III, IV, and V are barred by the

Defendant's conviction of Count II, and the plain language of § 46-11-503, MCA.

¶136 For these reasons, I concur with the result of the majority opinion, but do not agree with everything stated in that opinion.

/S/ TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing concurring opinion.

/S/ WILLIAM E. HUNT, SR.

Justice Jim Regnier concurring in part and dissenting in part.

¶137 I concur with the opinion of Justice Leaphart (hereinafter referred to as the "Court's opinion")[(6)] with the exception of its analysis of the former conviction statute, § 46-11-503, MCA, contained in subpart (c) to Issue 11. The issue in subpart (c) concerns whether the District Court erred in concluding that Hocevar's conviction for Criminal Endangerment in regard to Wesley's Benadryl overdose did not bar a subsequent prosecution on the charges arising out of Mathew's death. Because I believe that Wesley's Benadryl overdose and Mathew's death did not arise out of the same transaction, I would vote to affirm the District Court. I take this opportunity to restate some of the relevant facts.

¶138 On February 16, 1994, the State filed an Information charging Hocevar with two offenses, stated in the alternative, stemming from her son Wesley's Benadryl overdose. The State alleged that Hocevar had provided Wesley with Benadryl on May 21, 1992. The State also charged Hocevar with three offenses stemming from the death of her son Mathew from aspiration of vomitus. In regard to these charges, the State alleged that Hocevar had smothered Mathew in December 1991.

¶139 On June 29, 1994, Hocevar filed a motion to sever Counts I and II, the charges stemming from Wesley's Benadryl overdose, from trial on Counts III, IV, and V, the charges stemming from Mathew's death, contending that joinder of these charges violated § 46-11-404, MCA. The District Court denied Hocevar's motion to sever. On May 12, 1995, the jury returned a verdict of guilty as to Count II, Criminal Endangerment, with respect to Hocevar's conduct toward Wesley, but was unable to reach a verdict on Counts III, IV, and V pertaining to Mathew's death.

¶140 On May 22, 1995, the State filed a motion requesting the District Court to schedule a trial date for Counts III, IV, and V of the Information. Hocevar filed a Renewed Motion to Dismiss requesting that the District Court dismiss Counts III, IV, and V of the Information. Hocevar contended that a second trial for Counts III, IV, and V was prohibited by the plain language of § 46-11-503(1)(b), MCA (hereinafter also referred to as the "former conviction statute"). On December 18, 1996, the District Court denied Hocevar's motion to dismiss. The District Court concluded that pursuant to *State v. Berger* (1993), 259 Mont. 364, 856 P.2d 552, a second prosecution on Counts III, IV, and V was not barred because these charges did not arise out of the same transaction as Hocevar's Criminal Endangerment conviction.

¶141 On appeal, Hocevar asserts that we should overrule *Berger* because in deciding *Berger* we violated a principle of statutory construction by adding the requirement of "same transaction" to our interpretation of § 46-11-503(1)(b), MCA. In the alternative, Hocevar claims that Counts III, IV, and V relate to the same transaction as Count II and, therefore, a subsequent prosecution on the charges relating to her conduct with respect to Mathew's death is still barred under *Berger*. In this regard, Hocevar maintains that the counts arising from Wesley's hospitalization and the counts arising from Mathew's death are part of the same transaction for purposes of the former conviction statute because the State contended, and the District Court agreed, that the counts could be joined for trial under § 46-11-404, MCA.

¶142 The statute which Hocevar contends bars a retrial on the charges arising out of Mathew's death is § 46-11-503(1)(b), MCA, which provides, in relevant part:

> **Prosecution based on same transaction barred by former prosecution.**(1) When two or more offenses are known to the prosecutor, are supported by probable cause, and are consummated prior to the original charge and jurisdiction and venue of the offenses lie in a single court, a prosecution is barred if:

.. . .

> (b) the former prosecution resulted in a conviction that has not been set aside, reversed, or vacated.

¶143 I agree with the Court's conclusion that this provision only bars subsequent prosecutions of offenses arising out of the "same transaction." *See Berger*, 259 Mont. at 368, 856 P.2d at 554. Accordingly, the remaining question is whether the charges stemming from Mathew's death in December 1991 arose out of the same transaction as Hocevar's Criminal Endangerment conviction which derived from Wesley's Benadryl overdose in May 1992.

144 ¶When determining whether charges arose out of the same transaction for purposes of the former conviction statute we have referred to the definition of same transaction contained in § 46-1-202(22), MCA. *See State v. Waldrup* (1994), 264 Mont. 456, 459, 872 P.2d 772, 774. Section 46-1-202(22)(a), MCA, provides:

> "Same transaction" means conduct consisting of a series of acts or omissions that are motivated by:

(a) a purpose to accomplish a criminal objective and that are necessary or incidental to the accomplishment of that objective . . . .

¶145 The charges related to Mathew's death and the charges related to Wesley's hospitalization do not fit under the statutory definition of "same transaction" because Hocevar did not engage in conduct consisting of a series of acts motivated by a purpose to accomplish a *single criminal objective*. Rather, these events are the product of two separate criminal objectives which happen to share a noncriminal motivation. In one instance, Hocevar's alleged criminal objective was to smother Mathew. In the other, Hocevar's criminal objective was to endanger Wesley by providing him with Benadryl. These events are allegedly linked by Hocevar's noncriminal objective of seeking attention (the MSBP evidence). However, the sole fact that in both instances Hocevar was seeking attention does not bring these separate events within the definition of "same transaction." Seeking attention is not a criminal objective under the same transaction provision.

¶146 In my view, the court erred by confusing Hocevar's criminal and noncriminal objectives, thereby concluding that these separate events, Mathew's death and Wesley's overdose, are part of the same transaction. This error is manifested by the Court's conclusion that "the seeking of attention through the harming of one's children is a criminal objective." Court's opinion at ¶ 131. The objective of harming a specific person (e. g., Hocevar's son Mathew) has been criminalized, however, seeking attention has not. What the Court misconstrues is the fact that while Hocevar's conduct with regard to

Mathew is of a similar character as her conduct toward Wesley in that in both instances Hocevar committed criminal acts in order to receive attention, these events did not arise out of the same transaction because they did not share the same *criminal* objective. As delineated above, these counts arise out of two separate and distinct transactions because they have separate and distinct *criminal* objectives. One set of charges arose out of the acts Hocevar committed in order to further the criminal objective of smothering Mathew. The other set of charges arose out of the acts Hocevar committed in order to further the criminal objective of harming Wesley. These crimes are of a similar nature in that they both shared a noncriminal motivation, the seeking of attention.

¶147 Seeking attention is not a "criminal objective" in any sense under which we have previously analyzed the former conviction statute. In my view the meaning of "criminal objective" is fairly clear: a goal which has been criminalized. This is precisely how we have previously analyzed it. For instance, had the State alleged that Hocevar poisoned Wesley with a substance which was illegal to possess, a conviction for criminally endangering Wesley would have prevented a subsequent prosecution for the illegal possession of the poisonous substance. The unlawful possession of the poisonous substance was necessary in order to accomplish the criminal goal of poisoning Wesley. The two crimes would be united by a common *criminal* objective and thus be part of the "same transaction."

¶148 I note that the facts of this case are remarkably similar to the facts of *Waldrup* in which we held that multiple counts of indecent exposure filed against the defendant had not arisen out of the same transaction as previous charges for which the defendant had already been convicted. 264 Mont. at 459, 872 P.2d at 774. Like Hocevar, presumably Waldrup repeatedly exposed himself in order to garner attention. However, we did not conclude that the similarity in motive meant that the separate incidents were part of the "same transaction" for purposes of the former conviction statute. This is because this provision does not prohibit the subsequent prosecution of a defendant for other similar offenses which share a similar *noncriminal* motivation.

¶149 A comparison of two decisions interpreting § 46-1-202(22)(a), MCA, clearly supports the conclusion that smothering Mathew and providing Wesley with Benadryl are not part of the same transaction. In *State v. Sword* (1987), 229 Mont. 370, 747 P.2d 206, we concluded that the defendant had engaged in a series of acts for the purpose of accomplishing the criminal objective of unlawfully taking a grizzly bear. The defendant had pled guilty to violating the Endangered Species Act by knowingly possessing,

carrying, and transporting a grizzly bear taken unlawfully. The State subsequently filed an Information charging Sword with making false statements on a trophy license. The trophy license authorized Sword to possess and transport the grizzly bear. We concluded that the two charges arose from the same transaction because the false statements on the trophy license were necessary to the accomplishment of the criminal objective of possessing, carrying, and transporting a grizzly bear taken unlawfully. *Sword*, 229 Mont. at 374, 747 P.2d at 209.

¶150 In *State v. Tadewaldt* (1996), 277 Mont. 261, 922 P.2d 463, we concluded that a former conviction for DUI did not bar a subsequent prosecution for criminal possession of dangerous drugs because the acts were not motivated by the purpose to accomplish a common criminal objective. The defendant in this case, Tadewaldt, was arrested for driving under the influence. Immediately following his arrest, several pills were found in his possession which were later identified as dangerous drugs. Tadewaldt pled guilty to a DUI charge and moved to dismiss a separate prosecution for criminal possession of dangerous drugs, asserting that it arose out of the same transaction. We stated:

> The drugs forming part of the criminal possession charge had not been ingested and did not contribute to Tadewaldt's impairment. Thus, in statutory terms, Tadewaldt's conduct in possessing the dangerous drugs was not motivated by a purpose to accomplish the "criminal objective" of DUI, nor was it necessary or incidental to that "objective."

*Tadewaldt*, 277 Mont. at 267, 922 P.2d at 466.

¶151 The paradigmatic example of charges arising out of the "same transaction" is *Sword*. Sword engaged in a series of acts motivated by the purpose of furthering his single criminal objective of taking a grizzly bear unlawfully. On the other hand, *Tadewaldt* did not involve charges arising out of the same transaction, even though they arose out of the same arrest, because the acts were not motivated by a single criminal objective. The facts of the instant case are unlike the conduct at issue in *Sword*. Allegedly smothering Mathew was not necessary or incidental to the accomplishment of harming Wesley by providing him with an overdose of Benadryl. Rather, these incidents involved two separate *criminal* objectives, smothering Mathew on the one hand and providing Benadryl to Wesley on the other, which were similar in that they shared a *noncriminal* objective, gaining attention. Undeniably, the Court's "same transaction" analysis is muddled by the combination of criminal and noncriminal objectives contained in its conclusion that "the seeking of

attention through harming one's children is a criminal objective."

¶152 It is clear that the actual reason for the Court's conclusion that the charges arose from the same transaction for purposes of the former conviction statute is its belief that the State adopted "contrary" positions on joinder and on the former conviction statute. The Court's opinion states:

> Having successfully argued to the District Court that the Wesley counts and the Mathew counts are part of the "same transaction" for purposes of joinder, the State is then estopped from conveniently adopting a contrary position and arguing that the counts are not part of the "same transaction" for purposes of further prosecution under § 46-11-503, MCA.

Court's Op. at ¶ 127.

¶153 The Court's conclusion that the State has adopted contrary positions is based on a misunderstanding of the State's positions on joinder and on the former conviction statutue. The Court's opinion states:

> The State's theory, which was supported by expert testimony, was that Susan engaged in a series of acts towards Wesley and Mathew that were motivated by a desire to accomplish a criminal objective (drawing attention to herself through harming her children) and that the overdosing of Wesley and the smothering of Mathew were necessary to the accomplishment of that objective. The Mathew counts and the Wesley count thus come within the "same transaction" element of § 46-11-503, MCA.

Court's Op. at ¶ 131.

¶154 Actually, the Court's representation of the State's positions as inconsistent is not accurate. As the Court acknowledges, joinder and the applicability of the former conviction statute are separate issues. The language of these provisions, the decisions interpreting them, and the purposes which they further are distinct. The State's position on joinder has nothing to do with its position on the former conviction statute. The plain language of the joinder provision, § 46-11-404, MCA, does not limit joinder to charges arising out of the "same transaction," but rather includes charges which are of a "similar

character" or charges which are part of a "common scheme or plan."

¶155 The Court states that the State's entire prosecutorial theme was that all of the counts arose out of the same transaction, referring to the State's brief supporting joinder. *See* Court's Op. at ¶ 129. In fact, the State posed alternative arguments in its brief supporting joinder. The State did assert that the counts arose out of "a common plan" in that they were the product of Hocevar's MSBP pathology. However, the State also claimed that "[t]he charges in Counts I and II are of *the same or similar nature* to those in Counts III, IV and V" and should be joined because of their "striking similarity." (Emphasis added.) From these assertions, the Court draws the conclusion that the State is "estopped from conveniently adopting" a subsequent position on the former conviction statute which is inconsistent with one of its alternative arguments in its brief in support of joinder.[7]

¶156 As the Court observes throughout its opinion, the essence of the State's position on joinder was that joinder of the charges was proper because "in both instances Susan injured or killed her children in an attempt to draw attention to herself" and the State intended to call expert witnesses on MSBP which would be relevant to all the charges. Court's Op. at ¶¶ 66, 67, and 130. Significantly, the Court acknowledges that the District Court joined the charges for trial, not because they arose from the same transaction, but because the counts were "*similar in nature* and much of the proof . . . would apply to all counts." Court's Op. at ¶ 64 (emphasis added). We correctly affirmed the District Court's joinder of the charges *not* because they arose from the same transaction, but rather because the counts were "logically linked by the MSBP motive and proof regarding all the charges overlapped." Court's Op. at ¶ 67. Had the State argued that the charges could be joined for the sole reason that they were a series of acts motivated by the purpose to commit a single criminal objective, and more importantly, had the District Court agreed, it would have been error to have affirmed on that basis because, as noted above, the charges could not have been part of the "same transaction" for purposes of joinder-they did not share a "*single criminal objective*." Section 45-2-101(7), MCA (emphasis added).

¶157 The State's actual position with regard to the former prosecution statute was that Hocevar's conduct in relation to Wesley's overdose was "not necessary or incidental to the accomplishment of *any criminal objective related to the conduct alleged* [with respect to Mathew's death]." (Emphasis added.) It is clear to me that the State correctly maintained that the charges could be joined because they were of a similar nature and logically linked by evidence of motivation while at the same time maintaining that Hocevar's conviction did not bar a subsequent prosecution because Mathew's death was not incidental or

necessary to the accomplishment of Wesley's overdose. In no way are these positions inconsistent.

¶158 The resolution of this issue does not depend on one of the State's alternative arguments in its brief supporting joinder below, that is simply a red herring. The precise issue, as correctly framed by the Court, is "[w]hether further prosecution on counts III, IV, and V is barred by § 46-11-503, MCA." Court's Op. at ¶ 123. I would conclude that a conviction on one of the charges relating to Wesley's overdose does not preclude a subsequent prosecution on the charges relating to Mathew's suffocation because they do not arise out of the "same transaction." The conduct underlying the charges occurred on different dates, involved different victims, and, while they shared a common explanation of motive, the MSBP evidence, the acts were not in furtherance of a common *criminal* objective. Hocevar did not smother Mathew in order to further the criminal objective of endangering Wesley, nor was the smothering of Mathew necessary or incidental to Wesley's overdose.

¶159 Accordingly, I would affirm the District Court conclusion that a subsequent prosecution on charges arising from Mathew's death was not precluded on account of a previous conviction arising from Wesley's overdose.

/S/ JIM REGNIER

Chief Justice Jean A. Turnage and Justice Karla M. Gray, join in the foregoing dissenting

opinion.

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

1. Unless otherwise noted, the 1991 version of the Montana Code is cited throughout this Opinion.

2. At trial, Susan testified that she put tablets on the coffee table, but Dr. Pezzarossi testified that Susan told her on the day following the overdose that she had set out a dose of elixir.

3. MSBP, also known as factitious disorder by proxy, is a form of child abuse and refers to a pattern of behavior where a caretaker, usually a mother, fabricates or causes illness in another, usually a preverbal child, to gain attention.

4. Section 46-16-401(3), MCA, regarding the order of trial, states: The prosecutor and the defendant may, respectively, offer rebutting testimony only. However, the court, for good cause, may permit either party to offer evidence upon the original case at any time before the close of evidence.

5. We note that the definition of "common scheme" under § 45-2-101(7), MCA, is virtually identical to the definition of "same transaction," as set forth under § 46-1-202(23), MCA, and is therefore synonymous with "same transaction" for purposes of applying that portion of the joinder statute.

6. I refer to the "Court's opinion" rather than the "Majority opinion" for the following reason: the "same transaction" analysis contained in subpart (c) to Issue 11 of Justice Leaphart's opinion has been joined by only one other member of the Court, Justice Nelson. Justices Trieweiler and Hunt concur in the Court's result, barring a retrial of the charges arising from Mathew's death, but on different grounds. They contend that the former conviction statute bars subsequent prosecutions regardless of whether the charge which forms the basis of the subsequent prosecution arose out of the "same transaction." Therefore, although a majority of the Court would reverse the District Court and bar a retrial on Counts III, IV, and V of the Information, there is no majority opinion on that issue.

7. I am not aware of any previous case in which we concluded that a party could be held to one of its alternative arguments for purposes of all subsequent legal issues which arise during litigation; nor, apparently, is the Court, thus the lack of citation to any authority. *See* Court's Op. at ¶ 127.