No. 94-210

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

JOSE DELOS SANTOS, II,

      Defendant and Appellant.

FILED

AUG 24 1995

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and for the County of Hill,
The Honorable Thomas M. McKittrick, Judge presiding.


COUNSEL OF RECORD:

      For Appellant:

          Thomas J. Sheehy, Attorney at Law, Big Sandy,
Montana

          Lawrence A. LaFountain, Attorney at Law, Great
Falls, Montana


      For Respondent:

          Honorable Joseph P. Mazurek, Attorney General; John
P. Connor, Jr., and Michael S. Wellenstein,
Assistant Attorneys General, Helena, Montana

          Dave Rice, Hill County Attorney, Havre, Montana


Submitted on Briefs: July 28, 1995

Decided: August 24, 1995

Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

A jury in the District Court for the Twelfth Judicial District, Hill County, found Jose Delos Santos, II, guilty of felony theft and two counts of deliberate homicide. Santos appeals. We affirm.

The issues are:

1. Did the District Court err in finding Santos competent to stand trial?

2. Did the court err by admitting expert testimony elicited by the prosecution in violation of § 46-14-213(2), MCA?

3. Did the court err in refusing to allow the defense to play at trial certain videotapes of Santos?

4. Was Santos deprived of a constitutional right to an insanity defense by the court's refusal to give three jury instructions offered by the defense?

On the morning of March 4, 1993, the bodies of Walter and Thelma Gebhardt were found in their home just west of Havre, Montana. They had each been hit repeatedly in the head with a blunt object while they slept. They were sixty-one and sixty-seven years old, respectively. A bloodstained claw hammer was found in their living room, and their 1984 El Camino was missing.

Several adult children of the Gebhardts had visited their parents the night before they were killed. Based upon their statements, local law enforcement authorities began looking for Jose Delos Santos, II.

2

Santos had been staying at the Gebhardts' home for several weeks. He had arrived in Havre by freight train, inadequately dressed for the winter weather, and knocked on the Gebhardts' door. Although he was a complete stranger to them, the Gebhardts took him into their home. Santos was not at the Gebhardts' home when their bodies were found, although he had been there the night before.

On March 5, 1994, Santos was apprehended outside Virgelle, Montana, in the Gebhardts' El Camino. While he was being booked at the Chouteau County Jail, Santos said that he had changed the license plates on the El Camino and that he had killed the Gebhardts.

Santos subsequently gave a statement describing the murders in detail. He told the officers that he killed Walter Gebhardt because Walter had put him on the spot by asking him to show a picture of his girlfriend to visiting Gebhardt family members. He explained that he killed Walter by hitting him in the head with the claw hammer, and that he then killed Thelma by striking her with the hammer and choking her. He described burning documents which identified the owner of the El Camino and a pair of Walter's pants in the Gebhardts' living room fireplace "to destroy the evidence." He described switching the rear license plate on the El Camino with one from another vehicle before leaving the Gebhardts' home after the murders. He took with him his high school equivalency certificate, his birth certificate, food, clothing, and a letter from his girlfriend.

Prior to trial, Santos moved to be declared incompetent to stand trial. For purposes of that motion, he was examined by a psychiatrist on behalf of the State and a psychologist on behalf of the defense. After hearing the testimony of both experts and reviewing the written report prepared by the State's psychiatrist, the court denied the motion.

The case was transferred to Cascade County for trial on a defense motion for change of venue. After a week-long trial at which the central issue was Santos's mental state, a jury found him guilty on all charges. Santos appeals.

Issue 1

Did the District Court err in finding Santos competent to stand trial?

The standard for a district court's decision on whether a criminal defendant is fit to proceed to trial is set forth at § 46-14-103, MCA:

> A person who, as a result of mental disease or defect, is unable to understand the proceedings against the person or to assist in the person's own defense may not be tried, convicted, or sentenced for the commission of an offense so long as the incapacity endures.

The trial court must determine "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him." State v. Austad (1982), 197 Mont. 70, 78, 641 P.2d 1373, 1378, citing Dusky v. United States (1960), 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825. This Court's standard of review is

4

whether substantial evidence supports the district court's decision that the defendant was fit to proceed to trial.  State v. Statczar (1987), 228 Mont. 446, 456, 743 P.2d 606, 613.

Santos's attack on the District Court's decision is based on the adequacy of the court's findings rather than on the sufficiency of the evidence.  Under the above standard of appellate review, however, we must look to the sufficiency of the evidence.

The State's expert witness was Dr. William Stratford, a forensic psychiatrist.  Before offering his opinion that Santos was competent to stand trial, Dr. Stratford conducted a thorough examination of Santos and submitted a detailed report on his competency.  His examination included reviewing the sheriff's reports, a police report, autopsy reports, witness interviews and statements, Santos's interview with the arresting officers, and Santos's Seattle police department rap sheet.  He also reviewed Santos's records from the Seattle Mental Health Institute and a summary of Santos's contacts with a Seattle drop-in center.  Dr. Stratford spoke by phone with Santos's father.  In addition, he conducted interviews with Santos over the course of two days and administered eighteen different tests to him.

Dr. Stratford reported that Santos was twenty-four years old and had been living as a "street person" in Seattle before he came to Montana.  Dr. Stratford admitted that, to a lay person, Santos's record may look bizarre.  He stated, however, that the record revealed no clear-cut history of mental illness.

5

Dr. Stratford stated in his report that Santos has some intrusive paranoid ideas but that "it is also likely that much of the time he has learned to bring these issues up for effect knowing that they do influence health care examiners in general," and "[h]e certainly is not above or incapable of lying about issues such as this and is motivated to go to a hospital and certainly not to a prison or jail." At the hearing, Dr. Stratford stated, "I think it's also important to indicate that I think Mr. Santos is capable of emphasizing points like that consciously to attempt to impress someone that he's very disturbed." He reported that Santos had obtained elevated results on a test he administered to detect malingering and deception.

Dr. Stratford concluded that Santos suffers from a schizotypal personality disorder as well as being chemically dependent. However, Santos did well on a test to determine his competency to relate to and cooperate with his attorney and to fully understand the nature and quality of the proceedings against him. Dr. Stratford concluded his report to the court by stating that he believed Santos was competent to stand trial.

Santos's expert witness, psychologist Fredrick Wise, did not submit a written report to the court. His testimony at the competency hearing conflicted with that of Dr. Stratford in that Dr. Wise found Santos unresponsive and unable to comprehend what was going on. He concluded that Santos suffered from schizophrenia and was not fit to proceed to trial. Santos contends that the

6

court erred in ignoring Dr. Wise's testimony and in not attempting to reconcile or assess the positions of the two experts.

The testimony of one witness is sufficient to prove a fact. State v. Radi (1978), 176 Mont. 451, 462, 578 P.2d 1169, 1176. Additionally, the weight and credibility of witnesses are exclusively the province of the trier of fact. In the event of conflicting evidence, it is within the province of the trier of fact to determine which will prevail. State v. Flack (1993), 260 Mont. 181, 189, 860 P.2d 89, 94. In this instance, the trier of fact was the District Court.

Santos was able to discuss with Dr. Stratford his complete history, including the homicides. That ability cast doubt on Santos's claims that he was not able to converse with his counsel, cooperate with his counsel, respond to his counsel's questions, or recall facts. Santos was cooperative with Dr. Stratford, providing an array of information, including extensive information about the charged offenses. As the District Court noted at the competency hearing, there was no reason why Santos's counsel could not also get the same information.

Dr. Stratford's expert testimony and report clearly supported a finding that Santos was able to consult with and assist his counsel and that he had a rational as well as a factual understanding of the proceedings against him. We conclude that the District Court did not abuse its discretion in finding that Santos was fit to proceed to trial. We therefore affirm the court's determination.

Santos also asserts that the court should have reassessed its competency determination because of evidence presented after the competency hearing. He cites Drope v. Missouri (1975), 420 U.S. 162, 181, 95 S.Ct. 896, 908, 43 L.Ed.2d 103, 119, concerning the court's continuing obligation to be on guard for changes in a defendant's competence throughout the trial.

Santos refers to a report by Dr. Jack Hornby, a psychiatrist who prescribed medication for him after the competency hearing. Santos claims Dr. Hornby stated he felt Santos was not competent to stand trial. That comment is not found in the copy of Dr. Hornby's report provided to this Court. In his report, Dr. Hornby specifically noted that he had "not been asked to evaluate for competency." Further, Dr. Hornby's report was submitted to the court in support of a motion to continue the trial date to allow Santos additional time on his medication, not in connection with a determination of competency.

At the beginning of trial and at the close of the State's case, the defense moved to be allowed to have Santos testify in connection with his competency to proceed. In denying these motions, the District Court pointed out that, at the competency hearing several weeks earlier, it had heard a tape-recording of Santos's interview with Dr. Wise. The court also stated that it had been observing Santos during trial and that the proposed testimony would be self-serving. After reviewing the record, we conclude that no abuse of discretion has been shown in the denial of the motions to put Santos on the stand.

8

Santos also cites Dr. Wise's trial testimony that he saw Santos after the medication was prescribed by Dr. Hornby and that although Santos was calmer and easier to keep on track in conversation, his thoughts were still very disordered. Dr. Wise gave examples of statements by Santos which he felt indicated a lack of the requisite mental state to stand trial. However, after reviewing the record, we conclude that Dr. Wise did not testify to any statements markedly different from those which he had previously reported at the competency hearing.

We conclude that Santos did not present additional evidence requiring the court to reverse its earlier decision that Santos was fit to proceed to trial. Accordingly, that claim is denied.

As a final argument under this issue, Santos points out that Dr. Stratford's written report did not include a specific finding as to whether Santos was seriously mentally ill, as required under § 46-14-206(1)(b), MCA. This argument is raised for the first time on appeal. As such, we will not consider it. See State v. Arlington (1994), 265 Mont. 127, 151, 875 P.2d 307, 321.

Issue 2

Did the court err in admitting expert testimony elicited by the prosecution in violation of § 46-14-213(2), MCA?

Section 46-14-213(2), MCA, provides:

When a psychiatrist or licensed clinical psychologist who has examined the defendant testifies concerning the defendant's mental condition, the psychiatrist or licensed clinical psychologist may make a statement as to the nature of the examination and the medical or psychological diagnosis of the mental condition of the defendant. The expert may make any explanation reasonably serving to clarify the expert's examination and diagno-

9

sis, and the expert may be cross-examined as to any matter bearing on the expert's competency or credibility or the validity of the expert's examination or medical or psychological diagnosis. A psychiatrist or licensed clinical psychologist may not offer an opinion to the jury on the ultimate issue of whether the defendant did or did not have a particular state of mind that is an element of the offense charged.

The mental states which were an element of the offenses charged against Santos are "knowingly" and "purposely" as defined at § 45-2-101(33) and (58), MCA. In particular, "purposely" is defined under the statute and was defined for the jury in Instruction No. 23 as "[a] person acts purposely with respect to a result . if it is the person's conscious object to engage in that conduct or to cause that result."

The first testimony challenged by Santos as violative of § 46-14-213 (2),MCA, occurred on cross-examination of defense witness Dr. Wise. The prosecuting attorney asked Dr. Wise if he recalled Santos's statements that he had taken the victims' vehicle, had attempted to change the license plate and had driven the vehicle out of town. He then asked if Dr. Wise believed that Santos was "aware of where he was" and "aware of what he was doing" when he engaged in the described behavior. Dr. Wise replied that he assumed Santos did have such an awareness. The following colloquy then occurred:

Q. [Mr. Connor, the prosecuting attorney] At least by the defendant's own words, those acts would certainly demonstrate a purpose of the defendant to carry out specific abilities, would they not?

A. [Dr. Wise] I would say that, yes.

10

Q. And they at least demonstrate a conscious objective on his part to engage in a particular form of conduct, do they not?

A. Yes.

Q. And that it was his purpose, by his own description, to cause a particular result; correct?

A. Based on the interview, yes.

Also, in rebuttal testimony, the prosecution asked its own expert, Dr. Stratford, whether "going out of the house, changing the license plates on the car and taking the car to another location" were indications of Santos's capacity to act purposely or knowingly. Dr. Stratford answered that they were.

The State defends this line of questioning as not directly relating to Santos's mental state during the homicides. However, in so arguing, the State overlooks the charge of theft of the El Camino. The elements of that charge were described to the jury in Instruction No. 20 as "[a] person commits the offense of theft if he purposely or knowingly obtains or exerts unauthorized control over property of the owner, and has the purpose of depriving the owner of the property." Clearly, the above testimony relates directly to whether Santos possessed the requisite mental state of "knowingly" or "purposely" as to the theft of the El Camino. We conclude that the above testimony violated the § 46-14-213 (2), MCA, prohibition as to the charge of theft of the El Camino.

Under § 46-20-104(2), MCA, this Court may review any error which necessarily affects the judgment. However, "[n]o cause shall be reversed by reason of any error committed by the trial court against the appellant unless the record shows that the error was

11

prejudicial." Section 46-20-701(1), MCA. The trial transcript before us exceeds 700 pages in length; much of it was conflicting testimony from Drs. Wise and Stratford. Overall, the evidence against Santos was overwhelming. On the record before us, we conclude that the erroneous admission of the above brief questions and answers constituted harmless error.

Santos also challenges the State's questions to Dr. Stratford, which again occurred in rebuttal, as set forth below:

Q. [Mr. Connor] Doctor, without giving me specific instances, were the materials you read, in your professional opinion, replete with examples of conduct by the defendant which amounted to conscious deliberate behavior?

A. [Dr. Stratford] Yes, sir.

Q. And which amounted to conscious object to carry out particular actions?

A. That's correct.

Santos further challenges Dr. Stratford's comments on rebuttal concerning assessment of a person's ability to act knowingly and purposely as grounds for reversal.

The basis for these challenges is the 1991 commission comment to § 46-14-213(2), MCA. The comment notes that the last sentence of the subsection was added by the 1991 Montana Legislature, and states:

[T]he statute contains an additional statement expressly barring an expert opinion before a jury on the ultimate issue of the defendant's mental state or mental capacity.

The last portion of this comment, concerning mental capacity, goes beyond the language of the statute. Where a statute is clear on its face, a court is not to go beyond the facial language in

12

interpreting the statute. Section l-Z-101, MCA; Lovell v. State Comp. Mut. Ins. Fund (1993), 260 Mont. 279, 285, 860 P.2d 95, PP. We decline to read into § 46-14-213(2), MCA, a prohibition on testimony by expert witnesses concerning a criminal defendant's mental capacity. Questions and expert opinions on a criminal defendant's mental capacity are not prohibited under the above statute; what the statute prohibits are expert opinions on the ultimate issue of whether the defendant actually possessed the requisite mental state at the time the offense was committed.

We believe that this narrow reading of the statute supports the purpose of expert testimony as an aid to the finder of fact, based upon the expert's particular knowledge or experience, in determining the fact at issue. See Rule 702, M.R.Evid. The Supreme Court of Connecticut faced an analogous issue in State V. Forrest (Conn. 1990), 578 A.2d 1066. In that case, the issue was whether a mental health expert may give opinion testimony concerning a criminal defendant's capacity for self-control. Loss of self-control was an element of the defense of extreme emotional disturbance, which was a factual question before the jury. In ruling that the expert could give an opinion on the defendant's capacity for self-control, the court reasoned as follows:

> [I]n construing [the statute] narrowly, we have assumed that the legislature enacted the statute to accomplish a reasonable and rational result. A broad construction of the statute, taken to its extreme, would arguably bar experts from fully testifying to their diagnoses of a defendant and to their resulting professional opinions, from which the jury could infer the defendant's state of mind at the time of a particular act. Jurors would thus be left without adequate expert assistance in making an informed decision upon the ultimate issue of the defen-

13

dant's mental state, the precise issue expressly reserved
to them by [the statute].

Forrest, 578 A.2d at 1070 (citations omitted). The above comments by the Connecticut Supreme Court are equally applicable to the question here before us. See also Vitauts M. Gulbis, Annotation, "Admissibility of expert testimony as to whether accused had specific intent necessary for conviction," 16 A.L.R.4th 666 (1982).

The objection to questions and testimony on behalf of the prosecution concerning Santos's capacity to form the requisite mental states must further be viewed in the context of prior defense questions. The defense asked its expert Dr. Wise whether Santos had the capacity to understand his actions, to always know what he is doing, to remember what he had done, and to act in an intentionai or a conscious manner. As the State points out, the defense thereby opened the door to questions about Santos's capacity to form the requisite mental state.

To recapitulate, we hold that the District Court erred in allowing expert testimony in violation of § 46-14-213(2), MCA, concerning Santos's state of mind during the charged offense of theft of the Gebhardts' El Camino. We conclude, however, that such error was harmless. As to the convictions of deliberate homicide, we hold that the court did not err in admitting expert testimony into evidence.

### Issue 3

Did the court err in refusing to allow the defense to play at trial certain videotapes of Santos?

14

At trial, the defense proposed to play and introduce into evidence two videotapes of interviews of Santos which were made by defense counsel shortly after his arrest. The defense offered the videotapes as evidence of Santos's mental state. The State objected on hearsay grounds. The defense then offered to have Santos take the stand for cross-examination. The court refused to admit the proposed evidence.

Santos argues that because the videotapes were not offered to prove the truth of the matters asserted therein, they did not fit the Rule 801(c), M.R.Evid., definition of hearsay--that is, they were not offered to show that Santos's statements therein were true, but to show his poor state of mind.

Our standard of review on issues of admissibility of evidence is whether the district court abused its discretion. State v. Oman (1985), 218 Mont. 260, 263, 707 P.2d 1117, 1119. The State points out that, in rejecting the admission of the videotapes, the District Court noted that there were no safeguards to insure their integrity and that they were not staged by Santos. The probative value of the videotapes is suspect considering the circumstances under which they were made, including that Santos was not under oath. Their probative value is further limited in that they at best demonstrate Santos's mental state several days after the offenses occurred, not at the time of the crimes. Yet further support for the court's refusal to admit the tapes into evidence is Santos's failure to comply with the discovery rule requiring disclosure of the tapes to the prosecution prior to trial. See

15

§ 46-15-323(6), MCA.  We conclude that the District Court did not abuse its discretion by denying admission into evidence of the videotapes.

## Issue 4

Was Santos deprived of a constitutional right to an insanity defense by the court's refusal to give three jury instructions offered by the defense?

Santos offered three instructions to the jury which would have allowed him to rely upon an insanity defense.  All three proposed instructions were refused by the District Court.

Montana law allows consideration of a defendant's mental disease or defect at three stages of a criminal proceeding. First, prior to trial the defendant may be examined to determine whether he is able to understand the proceedings against him or to assist in his own defense.  Section 46-14-103, MCA.  Second, a defendant may introduce evidence of mental disease or defect at trial whenever it is relevant to prove that he did not have a state of mind which is an element of the offense charged.  Section 46-14-102, MCA. Third, a defendant who has been convicted of a crime may claim during sentencing that at the time of the offense he was suffering from mental disease or defect which rendered him "unable to appreciate the criminality of [his] behavior or to conform [his] behavior to the requirements of law."  Section 46-14-311, MCA. Santos exercised all three of these options.

The constitutionality of the above statutory framework has been repeatedly upheld by this Court.  There is no constitutional

16

right to an insanity defense as expressed in the instructions proposed by Santos. <u>See</u>, State v. Cowan (1993), 260 Mont. 510, 861 P.2d 884, cert. denied, 114 S.Ct. 1371 (1994); State v. Byers (1993), 261 Mont. 17, 861 P.2d 860, cert. denied 114 S.Ct. 1380 (1994), reversed on other grounds, State v. Egelhoff (Mont. 1995), ___ P.2d ____, 52 St.Rep. 548. We hold that the District Court did not err in refusing the three jury instructions offered by Santos concerning a defense of mental disease or defect.

The judgment of the District Court is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____
Justices

_____
Hon. John W. Whelan, District
Judge, sitting in place of
Justice Terry N. Trieweiler

17

Justice Karla M. Gray, specially concurring.

I concur in the Court's opinion on issues 1, 3 and 4. I specially concur in that opinion on issue 2, because I agree with the result and much, but not all, of what is said therein.

Specifically, I agree that questions and answers regarding the defendant's mental capacity are permissible. I also agree that questions and answers which cross the line from capacity to purpose are impermissible under § 46-14-213(2), MCA, which prohibits psychiatrists and clinical psychologists from offering an opinion on the ultimate issue of whether the defendant did or did not have the state of mind which is an element of the offense charged. Thus, where the mental state element necessary to prove the charge is--as it is in the case before us--"purposely," no opinion can be given regarding whether the defendant acted with purpose. Since between three and five questions and answers of record violate the statutory prohibition against testimony on the ultimate issue of the defendant's mental state, I agree with the Court that those answers were erroneously admitted.

I also agree that, under §§ 46-20-104 and 46-20-701, MCA, the admission of this evidence does not affect the judgment in this case. The trial transcript before us exceeds 700 pages in length; much of it is conflicting expert testimony from Drs. Wise and Stratford. Overall, the evidence against Santos was overwhelming. Thus, I join in concluding that, on the record before us, the erroneous admission of between three and five brief responses

18

constitutes harmless error, without regard to whether it goes to the theft offense or the deliberate homicide charges.

In this latter regard, I disagree with the Court's tying of the objectionable questions and answers to the vehicle theft, rather than to the homicides. To this extent, I agree with the dissent. This distinction is not raised by the State and, indeed, is superfluous to the Court's analysis of this issue. Applying the controlling statutes correctly is a straightforward matter here: impermissible questions and answers were erroneously admitted into evidence but, given the overall record before us, the error is not reversible.

With regard to the dissent, I point out that most of the questions and answers quoted therein relate only to the discussion of the offense--whether theft or homicide--to which the questions related. That portion of the dissent does not, and could not correctly, suggest that all of the quoted questions and answers violate the statutory prohibition contained in § 46-14-213 (2), MCA, against an expert opinion on the ultimate issue of whether Santos acted purposely or knowingly. It is clear from reading the transcript segment quoted by the dissent that only the last questions quoted could conceivably violate the statute.

I join the Court in affirming on all issues.

_____
Justice

19

Justice W. William Leaphart, dissenting.


I concur in the Court's opinion on issues 1, 3, and 4. I dissent from the opinion on issue 2.

As heinous as this fact situation is, I am constrained to honor the dictates of the law as set forth in § 46-14-213 (2), MCA, which states in part: "A psychiatrist or licensed clinical psychologist may not offer an opinion to the jury on the ultimate issue of whether the defendant did or did not have a particular state of mind that is an element of the offense charged."

Santos was charged with deliberate homicide and felony theft. Both offenses require proof that he acted "knowingly" and "purposely." The legislature has defined "purposely" as follows: "[a] person acts purposely with respect to a result . . . if it is the person's conscious object to engage in that conduct or to cause that result." Section 45-2-101(58), MCA. It is thus clear that the Montana legislature has specifically stated that a psychiatrist or psychologist may not offer an opinion as to whether a defendant, when committing an act, acted knowingly, purposely or had a conscious object to engage in the conduct in question. There is no question but that in this case the prosecution elicited precisely this type of testimony from Dr. Wise with regard to Santos' striking of Walter Gebhardt with a hammer and using a rope to stop Thelma Gebhardt from breathing.

The Court quotes two of the questions posed by the prosecutor to Dr. Wise in which the prosecution very pointedly asked whether

20

certain acts "would demonstrate a purpose of the defendant to carry out specific abilities" and whether those acts would "demonstrate a conscious objective on his part to engage in a particular form of conduct . . . ." The Court then suggests that these questions related to Santos' theft of the vehicle rather than the homicides. The Court then concludes that, although the questions violated § 46-14-213(2), MCA, they were, in light of the overwhelming evidence, harmless error. However, when the questions are put in their full context, it is apparent that they related not only to the theft of the vehicle, but also to the homicides. As can be seen from the following excerpt of the transcript, Dr. Wise was asked to recall some very specific factual statements that Santos had made to Agent Scott in a written statement.

> Q Do you recall reading at the end of the statement, and if you have it available and need to refresh your recollection, please do so, but I would recall or direct your attention particularly to pages 33 and 34 of the transcript of the statement that was given by the defendant to Agent Scott.

> A The one I have goes up to 18.

> Q Well, you may have -- is it single spaced, Doctor?

> A Maybe you can direct me to that statement.

> Q I guess I'm talking about it's on the end, whether it's on may [sic] page 33 or your page 17 or whatever, where he makes a statement to agent Scott to the effect that he decided to take a particular action, he decided -- he thought about it, <u>he took a particular action by deciding to get the hammer and by going into Walter Gebhardt's room and hitting him in the head with it</u>.

> A Yes.

> Q And do you recall reading that portion of the

21

tape where he said that <u>he took the rope from the pulley that was above Thelma Gebhardt's bed and used it to keep her from breathing earlier</u>?

A I don't remember the pulley, but I remember reading the rest of it.

Q Do you recall reading the part from that statement where he stated that he decided to take money from Mr. Gebhardt's wallet?

A Yes.

Q Do you recall reading from that statement the portions where he stated that after striking the Gebhardts in the head, he decided to burn stuff in the fireplace and he specifically decided to do that to get rid of evidence?

A Yeah. I don't remember the words "specifically decided." I do remember that he did that and he said that, told that in the interview.

Q Do you recall him explaining to deputy, or rather to Agent Scott that the reason he did that was to get rid of evidence?

A Yes.

Q And do you recall him describing how he chose to take the car, to attempt to change the plates on it and to drive it out of town?

A Yes.

Q So at that point in time, at least, the defendant was certainly aware of where he was; correct?

A Yes.

Q He was aware of what he was doing; correct?

A I would assume that, yes.

Q <u>And he was aware of who he was doing it to; correct</u>?

A Are you talking about after the murder or before?

Q Well, I'm talking about his own statements to the agent about his conduct.

22

A Yeah, I would say just from those statements, I would refer that, yes.

Q At least by the defendant's own words, <u>those acts would certainly demonstrate a purpose of the defendant to carry out specific abilities</u>, would they not?

A I would say that, yes.

Q <u>And they at least demonstrate a conscious objective on his part to engage in a particular form of conduct</u>, do they not?

A Yes.

Q <u>And that it was his purpose, by his own description, to cause a particular result: correct</u>?

A Based on the interview, yes. [Emphasis added.]

Before asking Dr. Wise whether Santos' acts demonstrated a "purpose" and a "conscious objective on his part to engage in a particular form of conduct," the State prefaced the questions with certain facts--including the fact that Santos said he decided to get a hammer, that he went into Walter Gebhardt's room and hit him in the head with the hammer and that he took a rope and used it to keep Thelma Gebhardt from breathing. In addition to the questions already discussed, the State also inquired of Dr. Wise whether these acts indicated that Santos was "aware of what he was doing" and was "aware of <u>who</u> he was doing it to." Obviously the prosecutor's questions related to more than just the theft of the El Camino vehicle.

It is hard to imagine a more blatant violation of the statutory prohibition against having a psychologist express an opinion as to the defendant's state of mind at the time he is alleged to have committed a homicide. Here, the State was allowed

23

to elicit testimony from a psychologist to the effect that Santos acted purposely and had a conscious objective when he hit Walter with the hammer and used a rope to prevent Thelma from breathing.

The State obviously felt it necessary to present expert testimony on the question of the defendant's state of mind. Although I agree that more general questions as to the defendant's "capacity" to have a particular state of mind are legitimate, the questions posed here went well beyond general "capacity" type questions. They went directly to the ultimate question of whether the defendant had the requisite state of mind at the **time** the offenses were committed. In light of the bizarre and gruesome behavior of this defendant, I do not see how such an error can be considered harmless. The clear provisions of § 46-14-213(2), MCA, give me no choice but to dissent.

_____
Justice

24