No. 03-281

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 195

STATE OF MONTANA,

    Plaintiff and Respondent,

v.

RICHARD ARTHUR SANDROCK,

    Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and for the County of Cascade, Cause No. BDC 2001-262(A)
                The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Chad Wright (argued), Appellate Defender's Office, Helena, Montana

        For Respondent:

            Honorable Mike McGrath, Montana Attorney General, Tammy K Plubell
            (argued), Assistant Attorney General, Helena, Montana; Brant Light,
            Cascade County Attorney, Joel Thompson, Deputy County Attorney, Great
            Falls, Montana

                                    Heard on Oral Argument:  April 16, 2004

                                               Submitted:  April 27, 2004

                                                  Decided:  July 27, 2004

Filed:

        _____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Richard Arthur Sandrock (Sandrock) appeals the judgment of the Eighth Judicial District Court, Cascade County, denying his motion for a mistrial and allowing a social worker to testify about matters concerning sexual abuse and religious manipulation and control.

¶2 We address the following issues on appeal and affirm:

¶3 1. Did the District Court abuse its discretion when it denied Sandrock's motion for a mistrial?

¶4 2. Did the District Court abuse its discretion when it allowed a social worker to testify about matters concerning sexual abuse and religious manipulation and control?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Sandrock met Lorri Sandrock (Lorri) in late 1987 in Great Falls. They married in 1988, during a private ceremony in Lorri's bedroom. Lorri had a daughter, Megan, from a previous marriage, who was seven years old at the time Sandrock and Lorri "married."

¶6 Sandrock told Lorri that he was the fourth Son of God and that Megan was his natural daughter. He referred to Lorri as "Lorelei" and to Megan as "Zeri." He referred to himself as "Mikahila."

¶7 About a year after they married, Lorri and Megan went to stay with Lorri's parents in Billings. While she was gone, Sandrock and Lorri kept in contact through letters.

¶8 In these letters, Sandrock told Lorri that he had God-like powers, calling himself a death angel, as God assigned him the task of destroying those who needed it. He constantly told Lorri that "[t]o fail or go back on one's word or not serve totally will meet with a

2

punishment no one would want to pay." He ordered Lorri to receive tattoos--fourteen in total--and ordered that Lorri have Megan tattooed as well. Sandrock also demanded that Lorri and Megan live by his "Ten Basic Laws."

¶9 In his letters, Sandrock told Lorri that he would take Megan as his wife. He instructed Lorri to teach Megan how to be his wife, namely how to kiss and to perform oral sex. Lorri did as she was told, as she feared for her life and the life of her daughter.

¶10 Lorri and Megan returned to Great Falls in the summer of 1989. Lorri and Sandrock then lawfully married on August 18, 1989.

¶11 Lorri and Megan lived a life of abuse and isolation that was controlled by Sandrock--a fact to which he did not dispute. Sandrock conducted "opening of the mind sessions" with Megan. In these sessions, Sandrock told Megan that she would be an adult at age eight, which meant that she could then hug and kiss him. Sandrock then began having sexual intercourse with Megan, eventually abusing Megan daily. Megan, at that time, was in the third grade. Sandrock continued abusing Megan until she was fifteen years old, stopping only after Megan purposely gained enough weight that Sandrock found her disgusting.

¶12 Lorri's niece, Sonja, who was nine years old at the time, thereafter began visiting the Sandrock home annually. Sandrock abused Sonja just as he had abused Megan, claiming that she was his wife and that he again had God-like powers.

¶13 Sandrock never spoke "religiously" outside of the home. He maintained regular employment, handled the family finances, had no legal problems, and never took medication during the thirteen years Lorri and Megan endured his abuse.

3

¶14 In January 2001, Sonja told her parents about the abuse and ultimately reported the abuse to law enforcement. Lorri and Megan confirmed the years of sexual and emotional abuse. Subsequently, Sandrock was charged with three counts of sexual intercourse without consent, twelve counts of incest, and two counts of tampering with a witness.

¶15 Sandrock maintained that he was suffering from a mental disease or defect, and could not have committed the crimes with which he was charged, as he could not have formed the requisite mental state.

¶16 During Sandrock's trial, the jury received considerable testimony regarding the aforementioned occurrences. The jury also received considerable expert testimony, including that of Dr. Joseph Rich (Dr. Rich) and Angela Dailey (Dailey).

¶17 In the course of discussing his review of the letters that Sandrock wrote to Lorri, Dr. Rich, a forensic psychiatrist with thirty years of experience, testified that he believed Sandrock knew right from wrong. Sandrock objected to this testimony as going to the ultimate issue of the case and moved for a mistrial. The District Court denied this motion.

¶18 Dailey, a clinical social worker and qualified expert in sexual abuse, also testified about her experiences in a "Christian sect" and the sexual and religious manipulation that were part of her experience. Sandrock objected to this testimony as well, claiming it was irrelevant. The District Court overruled Sandrock's objection.

¶19 Ultimately, the jury convicted Sandrock on all counts.

¶20 Sandrock now appeals the District Court's denial of his motion for a mistrial and the admission of Dailey's testimony. The specifics of both Dr. Rich's and Dailey's expert

4

testimony are the subject of Sandrock's present appeal. This specific testimony will be discussed as it becomes applicable in the following analysis.

## STANDARD OF REVIEW

¶21 We review a district court's evidentiary rulings to determine whether the district court abused its discretion. *State v. Strauss*, 2003 MT 195, ¶ 18, 317 Mont. 1, ¶ 18, 74 P.3d 1052, ¶ 18. A district court has broad discretion in determining the admissibility of evidence, and we will not overturn a district court's rulings absent an abuse of discretion. *Strauss*, ¶ 18.

## DISCUSSION

¶22 **1. Did the District Court abuse its discretion when it denied Sandrock's motion for a mistrial?**

¶23 Sandrock argues that the District Court abused its discretion in denying his motion for a mistrial because Dr. Rich's testimony regarding Sandrock's ability to distinguish right from wrong violated the statutory prohibition on ultimate issue testimony. Specifically, Sandrock contends that Dr. Rich "testified directly about Sandrock's mental state," namely that "Dr. Rich told the jury that while Sandrock was an 'oddball' he 'knew right from wrong' when he committed these crimes." Sandrock argues that by allowing this testimony, the State of Montana (the State), in effect, was allowed to "supplant" its need to prove Sandrock's mental state.

¶24 The State argues that Dr. Rich did not "give specific testimony that Sandrock acted with purpose or knowledge during the sexual offenses. . . ." Further, the State argues that "the prosecutor did not ask Dr. Rich **any** questions regarding Sandrock's ability to act with purpose or knowledge at the time of the charged offenses." [Emphasis in original.] Rather,

5

the State argues that Dr. Rich's statement "was simply clarifying that a personality disorder does not, in and of itself, mean that a person cannot discern right from wrong." And, the State argues that Dr. Rich was referring to Sandrock's letters when he made his statement and "not to Sandrock's state of mind during the offenses charged." Moreover, Sandrock did not request Dr. Rich's statement be stricken, nor did he request a cautionary jury instruction. Indeed, the prosecutor was the one to request a cautionary instruction. Regardless, the State contends that should this Court hold that Dr. Rich's statement violated § 46-14-213(2), MCA, admission of that statement was harmless error.

¶25 A person commits the offense of sexual intercourse without consent if that person "knowingly has sexual intercourse without consent with another person. . . ." Section 45-5-503(1), MCA. Knowingly is defined as follows:

> [A] person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when the person is aware of the person's own conduct or that the circumstance exists. A person acts knowingly with respect to the result of conduct described by a statute defining an offense when the person is aware that it is highly probable that the result will be caused by the person's conduct. When knowledge of the existence of a particular fact is an element of an offense, knowledge is established if a person is aware of a high probability of its existence. . . . Section 45-2-101(34), MCA.

¶26 In Montana, no constitutional right to an insanity defense exists. However, Montana does allow consideration of a defendant's mental disease or defect at three separate stages of a criminal proceeding: (1) prior to trial, a defendant may be examined to determine whether he is able to understand the proceedings against him or to assist in his own defense, § 46-14-103, MCA; (2) at trial, a defendant may introduce evidence of mental disease or

6

defect whenever relevant to prove that he did not have the requisite mental state, § 46-14-102, MCA; and (3) during sentencing, a convicted defendant may claim that at the time he committed the offense, he was suffering from a mental disease or defect that rendered him unable to appreciate the criminality of his behavior or to conform his behavior to the requirements of law, § 46-14-311, MCA. *See also State v. Santos* (1995), 273 Mont. 125, 137-38, 902 P.2d 510, 517.

¶27    Expert testimony is allowed when "scientific, technical, or other specialized knowledge" held by an expert "will assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." Rule 702, M.R.Evid. A witness qualifies as an expert witness through the expert's "knowledge, skill, experience, training, or education," and an expert may testify to matters in the form of an opinion. Rule 702, M.R.Evid. Testimony that is in the form of an opinion or an inference, that would otherwise be admissible, "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Rule 704, M.R.Evid.

¶28    Regarding a psychiatrist's expert testimony, that psychiatrist "may make a statement as to the nature of the examination and the medical or psychological diagnosis of the mental condition of the defendant . . . [including] any explanation reasonably serving to clarify the expert's examination and diagnosis. . . ." Section 46-14-213(2), MCA. However, "[a] psychiatrist . . . may not offer an opinion to the jury on the ultimate issue of whether the defendant did or did not have a particular state of mind that is an element of the offense charged." Section 46-14-213(2), MCA.

7

¶29 In *Santos*, the defendant killed two elderly people and then stole their El Camino in an attempt to escape. *Santos*, 273 Mont. at 129, 902 P.2d at 512. In reviewing the district court's evidentiary rulings, we held that admission of the following testimony, although harmless error, was violative of § 46-14-213(2), MCA. We held that this testimony related "directly to whether Santos [the defendant] possessed the requisite mental state of 'knowingly' or 'purposely' as to the theft of the El Camino." *Santos*, 273 Mont. at 134, 902 P.2d at 515. This testimony included:

> Q: At least by the defendant's own words, those acts would certainly demonstrate a purpose of the defendant to carry out specific abilities, would they not?
>
> A: I would say that, yes.
>
> Q: And they at least demonstrate a conscious objective on his part to engage in a particular form of conduct, do they not?
>
> A: Yes.
>
> Q: And that it was his purpose, by his own description, to cause a particular result; correct?
>
> A: Based on the interview, yes.

*Santos*, 273 Mont. at 134, 902 P.2d at 515.

¶30 The above-quoted testimony came after the jury heard testimony that the defendant "had taken the victims' vehicle, had attempted to change the license plate and had driven the vehicle out of town." *Santos*, 273 Mont. at 133-34, 902 P.2d at 515. The jury was instructed that "[a] person commits the offense of theft if he purposely or knowingly obtains or exerts unauthorized control over property of the owner, and has the purpose of depriving the owner

8

of the property." *Santos*, 273 Mont. at 134, 902 P.2d at 515. Taken together, the testimony related "directly to whether Santos [the defendant] possessed the requisite mental state of 'knowingly' or 'purposely'" because it targeted both the defendant's actions and his mental state at the time of the commission of the crime. *Santos*, 273 Mont. at 134, 902 P.2d at 515.

¶31 The defendant in *Santos* also argued that he did not have the requisite mental state to commit the homicides with which he was charged. Consequently, he argued that testimony elicited from a psychiatric expert violated § 46-14-213(2), MCA, as the testimony addressed the ultimate issue of his mental state. Specifically, the expert testified as follows:

> Q:   Doctor, without giving me specific instances, were the materials you read, in your professional opinion, replete with examples of conduct by the defendant which amounted to conscious deliberate behavior?
>
> A:   Yes, sir.
>
> Q:   And which amount to conscious object to carry out particular actions?
>
> A:   That's correct.

*Santos*, 273 Mont. at 135, 902 P.2d at 516.

¶32 In holding that the above-elicited testimony did not violate § 46-14-213(2), MCA, we noted the following:

> Questions and expert opinions on a criminal defendant's mental capacity are not prohibited under the above statute [§ 46-14-213(2), MCA]; what the statute prohibits are expert opinions on the ultimate issue of whether the defendant actually possessed the requisite mental state at the time the offense was committed.
>
> We believe that this narrow reading of the statute supports the purpose of expert testimony as an aid to the finder of fact, based upon the expert's particular knowledge or experience, in determining the fact at issue. *Santos*, 273 Mont. at 135, 902 P.2d at 516.

9

¶33    Hence, the expert's testimony, within the context that it was elicited, did not target the ultimate issue of whether Santos acted knowingly or purposely during the time he committed the homicides.  Rather, having consulted various materials, such as police reports and witness statements, the expert testified to his opinion of the defendant's mental state with regard to those reports and statements.

¶34    Here, Dr. Rich testified, in pertinent part, as follows:

[By Sandrock's attorney:]
> Q:    The jury has heard about the letters.  You know, there's stuff in there about thinking he is the Fourth Son of God and angels and you name it.  You have heard all the things that are in there calling people by their heavenly name, thinking his name is Mikahila.
>        Why not--why does that not show a serious mental illness, or does it?

[By Dr. Rich:]
> A:    It shows a serious something.  I guess it--if I put all this together, and I do want to talk about this in detail, but having read all these letters and looking at all the things that he had to say, and seeing how everything got focused right down on his control over some females, his control of them for one purpose, his sexual fulfillment.
>        Then I--I have come to the conclusion that, sure, maybe, maybe in this personality disorder he had over the years he had some feelings that he is kind of special and this is a schizotypal living out his fantasies, and I guess we have all had fantasies of being something pretty special.
>        But it is like he was living out his fantasies, and I am of the opinion that the way that he used all that really fits into the malingering aspect of this, as opposed to his mental disorder.  And there are just multiple citations in these letters that I can point to that, to me anyway, look very controlling, very manipulative.  And this entire purpose of just the fulfillment of his own narcissistic sexual needs to the exclusion of someone else's well-being.
>        And one other thought is that if an individual was seriously mentally ill, and really believed in this stuff when he was doing it, I have never seen anyone who was seriously mentally ill who was having fun, who was enjoying themselves.  You know, it is a very disturbing thing to be mentally ill, whether it is schizophrenia or schizotypal personality disorder.  Those are not fun ways to go through life, I am telling you.
>        And he is having fun in these letters.  He is making jokes.  And there are times when he is saying extremely serious and highly manipulative things.

10

And in the next paragraph, he will tell jokes to his wife, or give her advice on how to fill out her exemptions for the income taxes.

It doesn't make sense, except from a malingering point of view.

Q:    So you said adjustment disorder, schizotypal personality disorder. Are those mental diseases or defects or--

A:    Well, they are mental problems.  They are in the book, Manual of Mental Disorders.  Sure.  They're mental disorders, but it is different.

Q:    Like nicotine addiction?

A:    Marijuana use, you know, all kinds of things that we would feel are much more trivial in contrast to schizophrenia or delusional disorder.

But a personality disorder is a personality disorder, even with weird thoughts, even being an oddball, he still knew right from wrong.

And I can show you places in these letters where he is cautioning--

¶35    The ultimate issue before the jury was whether Sandrock acted purposely or knowingly with regard to the sexual intercourse without consent, incest, and tampering with a witness charges.  The above-quoted testimony shows that, with regard to the letters that Sandrock wrote to Lorri, it was Dr. Rich's expert opinion that Sandrock generally knew right from wrong when Sandrock wrote those letters.  Dr. Rich's testimony did not concern Sandrock's actions during the commission of the sexual intercourse without consent, incest, or tampering with a witness, unlike the testimony did in *Santos*, which concerned the defendant's actions during the theft and the defendant's mental state at that time.  Rather, Dr. Rich's testimony concerned his expert opinion of Sandrock's ability to know right from wrong with regard to the content of his letters.  The letters provided Dr. Rich examples of Sandrock's ability to know right from wrong at the time those letters were written, like the materials provided the expert in *Santos*.  Hence, we hold that Dr. Rich's testimony regarding

11

Sandrock's ability to know right from wrong did not target the ultimate issue of whether Sandrock actually possessed the requisite mental states at the time the sexual intercourse without consent, incest, or tampering with a witness occurred. The District Court did not err in denying Sandrock's motion for a mistrial.

¶36 **2.    Did the District Court abuse its discretion when it allowed a social worker to testify about matters concerning sexual abuse and religious manipulation and control?**

¶37    Sandrock argues that Dailey's expert testimony regarding cult behaviors, such as sexual abuse and religious manipulation and control, was irrelevant, and admission of it again worked to "supplant" the State's need to prove Sandrock's mental state.

¶38    The State argues that Dailey's testimony "provided the jury members with some context to digest the horrendous and bizarre uncontested facts of the case." Consequently, Dailey "did not provide any testimony specific to Sandrock, nor did she ever refer to him as a cult leader." In addition, the State argues that should this Court hold that Dailey's testimony was relevant, admission of her testimony was harmless "[s]ince Sandrock himself admits that he controlled Lorri, Megan, and Sonja. . . ." Hence, the State contends that Sandrock "can hardly claim he was prejudiced by Daily's very brief and generalized testimony."

¶39    Relevant evidence is evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, M.R.Evid. Generally, all relevant evidence is admissible. Rule 402, M.R.Evid. However, a court may exclude relevant evidence when the probative value of that evidence is "substantially outweighed by the danger of unfair

12

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, M.R.Evid.

¶40 Specifically, regarding sexual abuse and religious manipulation and control, Dailey testified as follows:

> Q: Have you presented any seminars or workshops or conferences?
>
> A: I am a guest speaker each year at the University of Montana in a Sociology of Cults class[1].
>
> Q: What is the topic of your speech?
>
> A: I talk about my own personal experience in what is mostly considered to be a Christian sect. And my primary reason for talking in that class is to talk about recovery issues, defection is what it's called, coming out of groups and the dynamics that are involved in coming out of those groups.
>
> . . .
>
> Q: Okay. Now, you said your own experience. Let's start with that. What--please tell the jury about your own experience in--what would you call it--unorthodox religious group?
>
> A: I would call it a Christian sect.
>
> Q: Okay. Please tell the jury about that.
>
> A: Okay. I was involved for nearly ten years in a religion that involved a belief in end time prophet. It was a sort of what might be referred to as a holiness group. The women wore long dresses.
>
> . . .

---

[1] There was no appeal of the District Court's ruling on Sandrock's challenges to Dailey's qualifications as an expert, and we take no position on that issue.

Q: Okay. Was there sexual abuse that took place, to your knowledge, in this cult or group?

A: After I left, I discovered that our pastor had been sleeping with almost every woman in the church and some of the kids. . . .

Q: I do not want to ask you your age, but you weren't involved as a licensed clinical social worker back then?

A: No.

Q: That took place afterwards?

A: Yes. I've been out of this group for 19 years.

. . .

Q: Do you treat people who have come out of these groups like that?

A: Yes. And I have to say in Teton County we don't have a lot of incidents of this sort of thing. But I have treated people who have come from as far as Bozeman and Helena who have come out of very rigid religious groups.

. . .

Q: Okay. Miss Dailey, let's get into the meat and potatoes. You received all that information, the letters, the communications between the defendant and his wife and daughter?

A: Yes.

Q: All right. And I'm not going to ask you a lot of specific questions about that, other than to say, do you recognize certain principles in those letters? Are there manifestations of certain principles of religious groups in those letters and in the materials?

A: Yes.

. . .

14

Q: All right. Could you give me some characteristics of how you would define a group like this?

A: Generally they involve rigid controlling beliefs. There is some sort of leadership that is thought to have some special relationship with God that is not necessarily available to everyone. The members are usually controlled at least to some extent by fear. Generally fear of hell or some kind of retribution from God. They tend to be more isolated, I think, than other mainstream religious groups.

. . .

Q: Okay. Next question is, you described a few of the, I guess, destructive elements; is that fair to say? Were there destructive elements in this group you were part of?

A: Yes.

Q: Then why did you not recognize that and leave? I guess that's the big question.

A: Well, because when you're in the group, you adopt the belief system. And the belief system usually has itself covered. Christian belief systems, for instance, like the one I was in, used scriptures from the Bible to support things like not having any associations with your family or other people in the world who speak against what you believe. So you become more and more isolated, for instance. There is less and less accountability to the outside world. And you expect to be persecuted for your beliefs. That's part of the belief system. So the more you get into it, the more you don't see it for what it is. You do not see that it's destructive.

¶41     Here, as evidenced by the above-quoted testimony, Dailey did not testify that Sandrock was a cult leader, nor did she state that Sandrock had formed a cult. By reference to her experiences in a "Christian sect," Dailey merely provided the jury a context for them to understand the intricacies of "religious groups" in general. In that respect, Dailey's testimony was relevant. In addition, Dailey's testimony was not unfairly prejudicial, as:

15

(1) Sandrock himself admitted to the control to which he subjected Lorri, Megan, and Sonja; and (2) Dailey did not state that Sandrock himself exhibited or performed the beliefs that are typical of the religious groups about which she testified in general.

¶42　A district court has broad discretion in admitting evidence. *Strauss*, ¶ 18. We will not disturb a district court's evidentiary rulings absent an abuse of discretion. *Strauss*, ¶ 18. A district court abuses its discretion if it "acts arbitrarily without conscientious judgment or exceeds the bounds of reason." *State v. Richardson*, 2000 MT 72, ¶ 24, 299 Mont. 102, ¶ 24, 997 P.2d 786, ¶ 24.

¶43　We hold that the District Court did not abuse its discretion in admitting Dailey's testimony or in denying Sandrock's motion for a mistrial, as both rulings did not rise to the above-quoted standard.

¶44　Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA O. COTTER
/S/ JIM RICE
/S/ JIM REGNIER

Justice John Warner, concurring.

¶45 I concur in the Court's decision. I write to explain my agreement with the Court's conclusion at ¶ 41 that the witness Dailey's testimony was relevant under Rule 401, M.R.Evid.

¶46 The positions of the parties as stated to the trial judge are:

Mr. Thompson: The main reason [for the testimony of Dailey] is to give a framework to the jury under which they can understand this – the way that these people lived, including the defendant. We've heard testimony in this case so far that is beyond the comprehension of a layperson to understand the dynamics of a relationship like this. Not only dynamics of how Lorri and Megan can be subjected and controlled by the content [sic], which we've heard here, but also under which the defendant can exert that control over them. It definitely requires an expert testimony to understand that and put it into some kind of framework . . . .

Mr. Jensen: Yeah, Your Honor. Here is my written – I've got lots of concerns with this, Your Honor. And one of them is, you know, we're not contesting any of this stuff happened. We're not disputing it. We're not saying that he didn't have control of these women. We're not saying the sexual abuse didn't happen, Your Honor.
    And so I don't know why the jury needs this additional information in order to make their decision in this case, because what it comes down to is mental disease or defect. And the state already has had three doctors look at him, Your Honor . . . .
    And what I think the state is trying to do, although they're couching it as not doing this, is to try and bolster Lorri up for her failure. And I didn't really attack her on that very vigorously, Your Honor. We've not been disputing that, and I'm not – my direction is what happened, where the nature of those things and my client's mental illness.
    What they're trying to do is alleviate any personal responsibility she may have in the jury's mind, whatever the jury thinks, and make my client even worse in their mind. What they're trying to do is try and explain away some of these behaviors. We're admitting all this stuff happened. We know it took years for it to come out. I think the jury understands why it took so long for it to come out based on the testimony of Megan.

17

And, Your Honor, I don't think it's relevant to any issue, and it's not necessary for them to make any determination of any of the issues in this case, my client's guilt or my client's mental state . . . .

Mr. Thompson: The focus is on the dynamic. I'll tell you how it's relevant to Mr. Sandrock, apart from the facts that this actually did happen. She's going to explain that there is a common dynamic to religious control, and then the jury can make the connection there to the fact that this was not an insane act . . . . These tools were used in a manner that was not under unknowing or unintentional.

¶47   The decision concerning relevance is in the broad discretion of the District Court. *Strauss*, ¶ 18. The trial judge was faced with making a decision whether the witness Dailey's testimony was for no purpose, or for the purpose of making Mr. Sandrock a bad man, on the one hand, or on the other hand would tend to prove that he acted with purpose and knowledge. The trial judge, after hearing the voir dire of the jury, hearing the opening statements of counsel, listening to and observing the witnesses give several days of testimony, and considering the arguments of counsel, decided that the proposed testimony would tend to prove that Defendant Sandrock acted with purpose or knowledge, the main fact at issue.

¶48   The transcript indicates that this was a carefully considered decision taking into consideration the entire trial dynamic. It was indeed a difficult decision, but not one that I second guess. It was not an abuse of discretion.

/S/ JOHN WARNER

18

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶49    I concur in the Court's opinion on issue one, but respectfully dissent from that opinion on issue two. I would reverse the District Court's admission of Dailey's testimony and remand.

¶50    The record reflects that Dailey is a licensed clinical social worker. She first was designated an expert in the area of child sexual abuse over defense objections. Dailey later was designated as an expert in the area of "religiously controlling organizations, groups[,]" also over defense objections.

¶51    Dailey's substantive testimony began with her personal experiences in a "Christian sect" nearly 20 years previously and her treatment of people who have "come out of very rigid religious groups." It went on to discuss "principles of religious groups" and related "rigid controlling beliefs" in the context of information she reviewed relating to Sandrock's family. It is true that Dailey did not describe Sandrock as a cult leader or state that he had formed a cult; she did testify, however, about "cult" leadership and relationships. In any event, the fact that--as the Court puts it--Dailey "merely provided the jury a context for them to understand the intricacies of 'religious groups' in general" does not lead logically or legally to the Court's conclusion that the testimony was relevant.

¶52    Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

it would be without the evidence."  Rule 401, M.R.Evid.  "Evidence which is not relevant is not admissible."  Rule 402, M.R.Evid.

¶53    Sandrock was charged with three counts of sexual intercourse without consent, twelve counts of incest, and two counts of tampering with a witness.  The "facts of consequence" in this action were those necessary for the State to prove the elements of the offenses charged.  Those facts were presented through witness testimony and documentary exhibits.  Indeed, the record reflects that Sandrock did "not in any way contest[] the fact that both [victims] were sexually abused."  Thus, Dailey's testimony was totally irrelevant.  There simply was no fact "of consequence to the determination of the action" at issue in this case, as required for relevance in Rule 401, with regard to the "intricacies of 'religious groups' in general."  Consequently, I conclude that the District Court abused its discretion in admitting Dailey's irrelevant testimony.

¶54    Nor could it seriously be argued that Dailey's testimony--which covers in excess of 40 transcript pages--was not highly prejudicial to Sandrock.  Notwithstanding the care taken by the State not to elicit opinions from Dailey that Sandrock was a cult leader or had formed a cult, she was permitted to testify about cults, cult leadership and cult relationships.  No rational jury could have missed the (barely) implicit suggestion by the State via Dailey's testimony that Sandrock was just that--a cult leader.  And, indeed, the prosecutor made effective--if indirect--use of the testimony in his closing argument to the jury in the guise of commenting on Sandrock's mental disease or defect defense, as follows:

20

Charles Manson believed he could start a race war by killing a few affluent whites and making it look like it was done by hateful blacks, and the group would rule the world.

Jim Jones made a nice following by making his victims believe he was God. Under his leadership, they performed 100 sexual acts in front of each other. He made them believe the leader should have sex with so many of his congregation, and yet followed him down to Guyana where they drank poisoned Kool-Aid and killed themselves with their children.

No testimony from any witness other than Dailey could have supported these kinds of arguments. And what juror who remembers, as I do, the horrors and consequences of those cult leaders, having heard Dailey's testimony, could have done other than conclude that Sandrock was in fact a cult leader and fail to even consider the evidence supporting Sandrock's mental disease or defect defense from one of the leading experts in Montana?

¶55 It is my view that the State sought to present Dailey's irrelevant testimony for these very reasons, namely, to poison the jury against Sandrock's defense and the expert testimony which supported it long before the defense had an opportunity to put on its case. While one cannot, of course, say with certainty that this strategy resulted in the jury rejecting Sandrock's defense, I believe one can say that the admission of Dailey's irrelevant testimony was substantially prejudicial to Sandrock.

¶56 I would reverse the District Court's admission of Dailey's testimony and remand for a new trial. I dissent from the Court's failure to do so.

/S/ KARLA M. GRAY

Justice W. William Leaphart joins in the foregoing concurring and dissenting opinion.

/S/ W. WILLIAM LEAPHART

21